**GULF OIL CORPORATION, as owner pro hac vice, of the STEAMSHIP GULF-SPRAY, Plaintiff-Appellant-Cross Appellee,**

v.

**PANAMA CANAL COMPANY, Defendant-Appellee-Cross Appellant.**

No. 72-2074.

United States Court of Appeals, Fifth Circuit.

June 29, 1973.

---

Joseph C. Smith, New York City, David De C. Robles, Balboa, Canal Zone, for appellant.

Dwight A. McKabney, John L. Haines, Jr., Balboa Heights, Canal Zone, for appellee.

Before JOHN R. BROWN, Chief Judge, and THORNBERRY and MORGAN, Circuit Judges.

JOHN R. BROWN, Chief Judge:

Proving again that mortals die but some cases never do, see Brothers Inc. v. W. E. Grace Manufacturing Co., 5 Cir., 1963, 320 F.2d 594, 597–598,[1] this run-of-the-mill maritime allision, see Andros Shipping Co. v. Panama Canal Co., 5 Cir., 1962, 298 F.2d 720, 725, has gone from *Gulfspray I* to *Gulfspray II* and hopefully will end with this as *Gulfspray III.*[2]

What and all that is now involved is the issue of recoverable damages. That none but one of the questioned items would merit any more discussion than a single-worded Rule 21 opinion[3] highlights the fact that for the first time in 59 years the 1914 regulations culminating in § 293 of the Canal Zone Code are the subject of judicial decision. Not until this case did Judge Crowe, in his two decades on the Canal Zone bench, ever consider it or for that matter apparently ever have to pass on a collision damage claim. But thereby in part hangs this tale. For unlike a private non-governmental tortfeasor whose settled "practice" in adjusting damage item claims would scarcely impress an adversary, Canal Company insists that in these six decades it has developed settled practices which, emanating from a sovereign's bosom, somehow have the force of the law of the Medes and Persians which altereth not, and certainly not in favor of allowing a disputed item.

Dollarwise the big items, both in principle and principal, are pre-judgment interest and the temporal duration of the detention period beyond the actual time of making repairs on which the Court in a Solomonic way, The Noah's Ark v. Bentley & Felton Corp., 5 Cir., 1961, 292 F.2d 437, 438, 1961 A.M.C. 1641, 1642, held both for shipowner and Canal Company by disallowing the former and allowing the latter. Neither party is satisfied and both appeal.[4] We hold that he was half right, half wrong. See Commercial Trading Co., Inc. v. Hartford Fire Insurance Co., 5 Cir., 1972, 466 F.2d 1239, 1241, 1972 A.M.C. 2495, 2496.

*In The Beginning*

The incident, long ago held in *Gulfspray I,* to give rise to a claim against Canal Company and determined in *Gulfspray II* to have been the fault of Canal Company, still has some relevance.

On April 2, 1966, the S/S GULFSPRAY, conned by Canal Company pilots left the Port of Cristobal for a southbound transit through the Canal anchoring in Balboa Harbor that evening. After shifting to a bunkering dock at Balboa she departed in the early hours of April 3, 1966. Shortly after entering the Canal bound for the Pacific terminal it was discovered that a 15-20° right rudder was required to maintain

1. The observation was first made by Mr. Justice Story in Ocean Ins. Co. v. Fields, 18 Fed.Cas. 532. We have found it *a propos* on several occasions. Brown & Root, Inc. v. American Home Assurance Co., 5 Cir., 1965, 353 F.2d 113, 119; 1965 A.M.C. 2689; Oil Screw Noah's Ark v. Bentley & Felton Corp., 5 Cir., 1963, 322 F.2d 3, 10, 1964 A.M.C. 59, 67.

2. *Gulfspray I:* Gulf Oil Corp. v. Panama Canal Co., 5 Cir., 1969, 407 F.2d 24, 1969 A.M.C. 1, reversing, D.C.Z., 196, 269 F.

Supp. 793; *Gulfspray II:* 5 Cir., 1970, 311 F.Supp. 1307.

3. See NLRB v. Amalgamated Clothing Workers of America, 5 Cir., 1970, 430 F.2d 966.

4. Canal Company's cross appeal attacks the trial court's allowance of ten out of fifteen items rejected wholly or partially in the administrative handling of the claim by Canal Company. The Court sustained Canal Company's rejection of five items and except for prejudgment interest shipowner acquiesces.

the channel course. After departing the sea buoy at 0512 hours the vessel continued to take a 15-20° right rudder. Her master determined to return to Canal Zone waters for underwater inspection which he did at about 1218 hours.[5] On April 4, a Canal Company diver determined that the rudder was in a position 22 inches off center to the left when the rudder indicators were in an amidships position.

In view of this information as to the extent of her damage, it was decided that the GULFSPRAY should deviate from her voyage to Yokahoma and proceed directly to San Pedro, California, to make repairs. It was necessary to discharge her cargo of jet fuel at San Pedro.

Counting the time from putting back into the Canal Zone, survey and inspection there, steaming time to San Pedro, time required for surveys, inspections, discharging, reloading of the vessel, and making repairs, the District Court, 335 F.Supp. 406, found that a total of 11 days was lost and detention claim items were computed on that basis.

Canal Company asserted unsuccessfully that detention and related expenses should be confined to the four days actually used in making the repairs in the shipyard at San Pedro. But the Judge under compulsion of the Canal Zone Code did disallow pre-judgment interest.

### The Ebb And Flow of Sovereign Immunity

As *Gulfspray I* develops, the change in the political and industrial structures of Panama Canal operations brought about a marked relaxation in sovereign immunity and a like extension of the waiver. In 1914, Congress ordained the promulgation of regulations to permit the acceptance and payment of claims for vessel damage *in* the locks (now 2 C.Z.C. § 291). In the major restructuring of the Panama Canal operations in 1950, Congress for the first time prescribed a like liability for injuries *outside* the locks. By § 292 of the Canal Zone Code,[6] in its post-1950 form, Congress imposed on Canal Company the obligation to "promptly adjust and pay damages". Undoubtedly because of the international character of these waters and the likelihood that the great majority of the claims would be asserted either by foreign governments or their nationals for damage to men of war or privately owned merchantmen, the approach was an affirmative one, rather than the

---

5. On return to the Canal Zone on April 3, a request for investigation by the Board of Local Inspectors was made although none had been made prior to departure earlier that day. In *Gulfspray I*, reversing the District Judge, we held that this immediate request for inspection satisfied the provisions of 2 Canal Zone Code § 297 requiring notice of a damage claim and request for inspection before departure.

§ 297. Investigation of accident or injury giving rise to claim

Notwithstanding any other law, a claim may not be considered under this subchapter, or an action for damages lie thereon, unless, prior to the departure from Canal Zone waters of the vessel involved:

(1) the investigation by the competent authorities of the accident or injury giving rise to the claim has been completed; and

(2) the basis for the claim has been laid before the Panama Canal Company.

2 C.Z.C. § 297, 76A Stat. 25.

6. 2 C.Z.C. § 292 provides as follows:

§ 292. Injuries outside locks

The Panama Canal Company shall promptly adjust and pay damages for injuries to vessels, or to the cargo, crew, or passengers of vessels which may arise by reason of their presence in the waters of the Canal Zone, other than the locks, when the injury was proximately caused by negligence or fault on the part of an officer or employee of the Company acting within the scope of his employment and in the line of his duties in connection with the operation of the canal. If the negligence or fault of the vessel, master, crew, or passengers proximately contributed to the injury, the award of damages shall be diminished in proportion to the negligence or fault attributable to the vessel, master, crew or passengers. * * *

76A Stat. 23.

traditional negatively framed waiver of sovereign immunity.[7]

In this structure it was therefore appropriate that—to use a term coined much later in the 20th Century—*guidelines* were ordained for the settlement of such claims. The heart of our problem is found in § 293 [8] of the 1963 recodification which in its current form is virtually a codification of regulations originating in 1914 as issued by the Governor of the Canal Zone, later executive orders of the President [9] and finally leg-

7. Compare Suits in Admiralty Act, 46 U. S.C.A. § 742; Public Vessels Act, 46 U.S.C.A. § 781; and Federal Torts Claims Act, 28 U.S.C.A. §§ 1346(b), 2674 which speak in terms of the government being *liable*, not in terms of an affirmative obligation to adjust and pay. For a discussion of the interrelationship of these acts see DeBardeleben Marine Corp. v. United States, 5 Cir., 1971, 451 F.2d 140.

8. § 293. Measure of damages generally

In determining the amount of the award of damages for injuries to a vessel for which the Panama Canal Company is determined to be liable, there may be included:

(1) actual or estimated cost of repairs;

(2) charter hire actually lost by the owners, or charter hire actually paid, depending upon the terms of the charter party, for the time the vessel is undergoing repairs;

(3) maintenance of the vessel and wages of the crew, if they are found to be actual additional expenses or losses incurred outside of the charter hire; and

(4) other expenses which are definitely and accurately shown to have been incurred necessarily and by reason of the accident or injuries.

Agent's fees, or commissions, or other incidental expenses of similar character, or any items which are indefinite, indeterminable, speculative, or conjectural may not be allowed. The Panama Canal Company shall be furnished such vouchers, receipts, or other evidence as may be necessary in support of any item of a claim. If a vessel is not operated under charter but by the owner directly, evidence shall be secured if available as to the sum for which vessels of the same size and class can be chartered in the market. If the charter value can not be determined, the value of the use of the vessel to its owners in the business in which it was engaged at the time of the injuries shall be used as a basis for estimating the damages for the vessel's detention; and the books of the owners showing the vessel's earnings about the time of the accident or injuries shall be considered as evidence of probable earnings during the time of detention. If the books are unavailable, such other evidence shall be furnished as may be necessary.

2 C.Z.C. § 293, 76A Stat. 23.

9. Canal Companys brief reflects this history:

Section 293 appears in title 2, Canal Zone Code, 76A Stat. 23. The present Code took effect January 2, 1963, and is a reenactment of the 1934 Code, as amended, that had superseded the general laws and special acts of the United States that made up the law of the Canal Zone during the period from 1904 until 1934. The enumeration of classes of damages payable by the Government in vessel accident claims was first set out in regulations having the force and effect of law, and later in a law, in substantially the same terms that appear in the present section 293.

By Act of August 24, 1912, Congress provided that regulations should issue allowing prompt adjustment by agreement and immediate payment, of claims for damages arising from the passing of vessels through the locks of the Canal. § 5, 37 Stat. 562. The President of the United States in Executive Order 1990, July 9, 1914, authorized the Governor of The Panama Canal to issue rules governing the adjustment of claims and to approve settlements with shipowners. Pursuant to that order, Governor Harding on July 11, 1918, issued Governor's Circular No. 720 containing the claims rules.

Circular No. 720 remained in effect until January 1, 1924, when it was superseded by Executive Order 3938, dated December 20, 1923, which stated, verbatim, the six numbered paragraphs of Governor Harding's 1918 circular. Those measure-of-damage provisions remained in effect until September 25, 1925 when they were superseded by Rule 94 that was contained in Executive Order 4314. Rule 94 remained in effect until it was reissued and renumbered as Rule 95 by Executive Order 9227 on August 19, 1942.

As one of several amendments to the Canal Zone Code that were made by

islation enacted by Congress in 1950. But, of course, this was backed up in § 296 by the traditional language which allowed suit to a claimant "who considers himself aggrieved by the findings, determinations, or award . . ." of Canal Company.[10]

*We Never Have—So Why Pay Now?*

With respect to each of the ten items allowed over Canal Company's objection and the disallowed prejudgment interest, Canal Company through claims managers, auditors, examiners, both present and past, sought to establish that these types of claims had never been allowed. They were rejected for GULFSPRAY since the pattern of rejection had been consistent and no one had ever challenged it in Court although § 296 (note 10, *supra*) opened up an available and physically/geographically contiguous courthouse door. The Judge credited this testimony. But he pointed out that these witnesses ". . . quoted entirely from memory relative to the criteria that has been established throughout the years in settling claims of the nature herein, and no manual or well-defined rules for the interpretation of the statute were ever presented . . ." in Court.[11]

The Judge summed it up in this pithy way. "The witnesses took refuge in the fact that it had just never been done any other way and that they had learned the method of settlement from their predecessors." The Judge then overruled Canal Company's objection to the ten items because the ". . . decisions [by Canal Company] . . . were arbitrary and based upon interpretations . . ." which the Judge regarded as outmoded and not in line with the interpretation which, he thought, called for "an equitable approach . . . with a view toward attaining justice for a damaged litigant . . . in harmony with the rest of the Code which did not become effective until 1962." In reaching this conclusion one thing emphasized by the Judge was that Canal Company in the past had been in a position to be quite arbitrary because of the limited opportunity for redress on the part of claimants.

On the Judge's crediting the historical practice followed in denying claims of these fifteen items, Canal Company insists that, as with any governmental administrative agency, these time honored consistent practices must be accepted by a Court entertaining a suit bottomed on dissatisfaction with such administrative rulings under § 296 (see note 10, *supra*). To sustain this they stress a number of cases in which courts have held that an established administrative construction of a statute should be observed.[12]

the Act of September 26, 1950 (effective July 1, 1951), Congress took the presidential regulations under Rule 95 and enacted them as § 10(c) of title 2 of the 1934 Code. Section 10(c) remained in effect until it was reenacted as section 293 in the present Code.

10. Section 296 provides in relevant part:
§ 296. Actions on claims
A claimant for damages pursuant to section 291 or 292 of this title who considers himself aggrieved by the findings, determination, or award of the Panama Canal Company in reference to his claim may bring an action on the claim against the Company in the United States District Court for the District of the Canal Zone. In the action, the provisions of this subchapter, relative to the determination, adjustment, and payment of claims, . . . shall apply. An action for damages cognizable under this section shall not lie against the Company, otherwise, nor in any other court, than as provided in this section; nor may it lie against any officer or employee of the Company.
2 C.Z.C. § 296, 76A Stat. 24.

11. There is an oblique reference to written directives, presumably within the claims division, but what their form is, how authorative, how precise, and whether routinely available to the public are matters completely undisclosed.

12. The Canal Company emphasizes Brown v. United States, 1884, 113 U.S. 568, 5 S.Ct. 648, 28 L.Ed. 1079; Unemployment Compensation Commission of Alaska v. Aragan, 1946, 329 U.S. 143, 153–154, 67 S.Ct. 245, 91 L.Ed. 136, 145; NLRB v. Hearst Publications, 1944, 322 U.S. 111, 64 S.Ct. 851, 88 L.Ed. 1170; Udall v. Tallman, 1965, 380 U.S. 1, 18, 85 S.Ct. 792, 13 L.Ed.2d 616, 626.

And they particularly stress those which indicate that these principles have particular force where there has been acquiescence by the public in a governmental agency's interpretation of a law. FTC v. Mandel Bros., 1959, 359 U.S. 385, 391, 79 S.Ct. 818, 823, 3 L.Ed.2d 893, 898. We have, of course, accorded great significance to an administrative agency's interpretation of its own organic law and the existence of circumstances calling for the exercise of its powers even to the point of its determining initially its own jurisdiction.[13]

*Prior Rejections—How Significant?*

■■■■ Although in a claims-pay-waiver structure of this kind we think the considered practice in the administration of the act is a factor to be taken into account by the Court in a § 296 suit protesting the administrative handling by the Canal Company, we do not believe that this measures up to the significance accorded determinations by congressionally established administrative agencies (see note 12 and related text, *supra*). Apart from § 293 and its regulatory executive order predecessors (see note 9, *supra*) which specify allowable and nonallowable items, there is nothing in the administrative machinery which either calls for or provides a set of more or less formalized standards to govern the handling of a particular claim, and more significantly, individual items by the nature of the claim. One of the reasons why a consistent administrative interpretation or practice is of significance is that by its conduct the agency under review has made it known to the public dealing with it that these are the standards which will be and are employed. This gives a sort of fair notice so that those who are aggrieved by such practices can at least see that until challenged and overturned by Judicial review, if available, or by congressional action, the agency action will be taken on such standards. But to accord such significance to the routine day-by-day handling of individual cases with no apparent publication of the practices or results to persons other than those immediately concerned introduces the element of non-disclosure except at the point of decision—a result which stresses our notions of fairness and fundamental due process. Hill v. FPC, 5 Cir., 1964, 335 F.2d 355.

So far as we know, except perhaps for those parties who have dealt with Canal Company over the years in the administrative settlement of collision claims, the first time this so-called uniform practice ever saw the light of day was in the trial below when, also for the first time in the career of this distinguished trial Judge the Court was asked to put a judicial imprimatur on this practice. With a wisdom which must readily accord to him as great an understanding of Canal Zone law as we would attribute to a United States District Judge with respect to his own state,[14] Judge Crowe emphasized in his own way the change

---

13. See J. M. Huber Corp. v. Denman, 5 Cir., 1966, 367 F.2d 104, and Weymouth v. Colorado Interstate Gas Co., 5 Cir., 1966, 367 F.2d 84, where we referred to FPC's primary jurisdiction the issue of whether gas royalties are "sales of gas for resale in interstate commerce." FPC answered affirmatively, thereby subjecting the royalties to FPC administrative ceilings. In Mobil Oil Corp. v. FPC, 1972, 149 U.S.App.D.C. 310, 463 F.2d 256, cert. denied sub. nom., 1972, 406 U.S. 976, 92 S.Ct. 2409, 32 L.Ed.2d 676, reversed. See also International Paper Co. v. FPC, 5 Cir., 1973, 476 F.2d 121 [1973] (Brown, C. J., concurring); United States v. Moretti, 5 Cir., 1973, 478 F.2d 418 [1973]; Carter v. AT&T, 5 Cir., 1966, 365 F.2d 486.

14. See Bernhardt v. Polygraphic Co., 1956, 350 U.S. 198, 204, 76 S.Ct. 273, 100 L. Ed. 199, 206; Tardan v. Chevron Oil Co., 5 Cir., 1972, 463 F.2d 651, 652; United States v. Buras, 5 Cir., 1972, 475 F.2d 1370, 1371 n. 2 [1972] (Brown, C. J., dissenting from denial of rehearing en banc); Delduca v. United States Fidelity & Guaranty Co., 5 Cir., 1966, 357 F.2d 204, 205; Freeman v. Continental Gin Co., 5 Cir., 1967, 381 F.2d 459, 466; Sudderth v. National Lead Co., 5 Cir., 1959, 272 F.2d 259, 263; Petersen v. Klos, 5 Cir., 1970, 433 F.2d 911, 912.

in climate. The climate began by Canal Company being "in a position to be quite arbitrary because of . . . the limited opportunity for redress on the part of claimants. . .". But it was seriously affected, according to Judge Crowe, by the codification of § 293 which requires "an equitable approach . . . with a view toward obtaining justice for a damaged litigant . . . in harmony with the rest of the Code."

Part of the change of climate has come about by virtue of *Gulfspray I.* The fact that none of these socalled administrative determinations of individual damage items have ever gotten to Court has little significance and certainly not enough to infuse into the undisclosed standards of conscientious claims examiners the fiat of law. Acquiescence by these undisclosed numbers of claimants in these 60 years may, it is true, be counted as a sense of complete satisfaction on the part of claimants. On the other hand, it may have been the result of despair in surveying the likely travail of pursuing the sovereign with all of its resources to the point, as this case reflects, of three trials in the District Court and three trips to the Fifth Circuit on the mainland.

■ We therefore conclude that the administrative claims handling practice is a factor to be considered on presentation of damage items for Judicial determination. But they really bear upon reasonableness of the interpretation of the underlying Codal provisions (§ 293) and the objectives sought by that structure. The Court, as it would to an Elder Brethren of Trinity House or the Board of Local Inspectors in the Canal Zone, see Afran Transport Co. v. S/S Transcolorado, 5 Cir., 1972, 458 F.2d 164, 170–171, 1972 A.M.C. 1149, should give careful consideration to the claims analysis but it would be a mistake to frame this in terms of a presumption, procedural or substantive, that the rejection stands unless the claimant proves to the contrary.

*Maritime For The Maritime*

■ We think each of the items specifically under review here are readily solved by reaching a basic conclusion on the purpose which Congress finally had in mind in its 1950 enactment. On that we conclude that although some of the literal terms would sustain a different reading, Congress must have meant that, except for a few very rare situations, it was establishing, by a code, a recovery of damages substantially parallel to that accorded by the general maritime law, and certainly that of England and the United States.

Although in its 1914 inception this was at once both a bold and niggardly abandonment of the king-can-do-no-wrong for lock damage, much water had flowed through the juridical locks by the time Congress codified the regulations in 1950. By this time the Public Vessels Act and the Suits In Admiralty Act had been on the books and working effectively to expose the United States to the full liability of a private shipowner, see note 7, *supra.* And by the Federal Torts Claims Act, Congress in 1949 exposed the Government to almost unlimited claims having an origin in the laws of any of the fifty states.

Indeed, the enactment of § 292 (see note 6, *supra*) in the 1950 Act shows that Congress deliberately broke away from the past. Up to that time this self-imposed liability to adjust and pay claims was confined to damage done *in* the locks. Experience had proved that important as this was, it gave protection to vessel owners and others only to a very limited degree both temporally and geographically. Even more significant, the 1950 enactment was a part of a radical structural change in which the political and the industrial-business operations of the Canal Zone were sharply separated. *Gulfspray I:* 407 F.2d at 29, 1969 A.M.C. at 8–9. See also United States v. Husband R. (Roach), 5 Cir., 1971, 453 F.2d 1054. In divorcing the industrial-business activity from the political government of the area, what more logical thing was there to do than

provide a system by which the government was held accountable for consequences of its business activities on a substantial parity with that already established for the mainland or on the high seas? (See note 7, *supra*).

■ In this setting which markedly extended the nature of the Government's activities and the liabilities it was willing to take on as a vicarious industrial operator, the fact that the congressional enactment used words—or used some of the same words—that had for 35 years reflected a more niggardly approach does not tie the law to an interpretation of those words or phrases fit for the past but now wholly out of keeping with the present.

■ For damage arising out of the operation of the Canal the objective was to subject the Government to the liabilities of a private person. The substantive standard for maritime cases is unquestionably the general maritime law subject only to specific regulations of the Canal Zone. See Afran Transport Co. v. S/S Transcolorado, 5 Cir., 1972, 458 F.2d 164, and 468 F.2d 772 (on rehearing). There is no reason to suspect that Congress, familiar for a third of a century in dealing with governmental liabilities in relation to ships, thought that damages were to be determined on any other basis except with respect to a few isolated specifics.

■ Indeed, reading § 293 (see note 8, *supra*) one might conclude that it came right out of a hornbook on admiralty. Except for "Agents' fees or commissions, or other incidental expenses of similar character . . . " every other item enumerated in subparagraphs (1) through (4) and the concluding unnumbered paragraph track the maritime law. These include (1) actual or estimated costs of repairs plus (4) all other expenses shown to have been incurred necessarily by reason of the accident or the injuries. This would include the cost of tugs, pilotage, dockage, entry and clearance in seeking the port of refuge, entering or leaving the port of repairs, the cost of going in or out of shipyards, etc. The detention claim—which covers the value of the loss of use to the shipowner during the time his vessel is out of commission because of the casualty—is minutely covered by reference to (2) charter hire or if not chartered the going charter hire in the market for that trade and vessel (see unnumbered last paragraph) plus (3) wages and victualling of crew during the lay-up period.

Since it is true that "agents' fees or commissions or other incidental expenses of similar character" are frequently allowable under general maritime principles § 293 does—for this type of claim—prescribe a different standard. But the exclusion in the last unnumbered paragraph of "any items which are indefinite, indeterminable, speculative, or conjectural" tracks the maritime law precisely.

■ Except for these very insignificant little items, what § 293 seeks to achieve is what the maritime law seeks to achieve. The principle is broadly symbolized—*restitutio in integrum*. Ove Skou v. United States, 5 Cir., 1973, 478 F.2d 343, A.M.C. [1973]. And broadly translated and broadly applied it means to make good the total losses suffered by the shipowner for the casualty inflicted by the fault of another. Such losses are not confined to out-of-pocket expenses such as repair bills. They include the loss of the use of the vessel. With this approach the peculiar words of § 293 are not to be given a construction which ignores the goal of making the victim whole.

### Pre-Judgment Interest

■ As anyone would know whoever fingered a single volume of Benedict on Admiralty or thumbed through the leaves of Black and Gilmore, pre-judgment interest in a sole fault collision case has always been allowed by the maritime law. The Baltimore, 1869, 75 U.S. (8 Wall.) 377, 385, 19 L.Ed. 463, 465. Interest is treated as a part of the loss itself and not just for the delay in payment of the decree. Judge Crowe

recognized this but with another application of the curious reverse principle that the result must be so right because it is so wrong, see *Gulfspray I*: 407 F.2d at 26 & n. 3, 1969 A.M.C. at 4, he felt compelled to hold that the only way to recover interest was under paragraph (4) as an expense " . . . definitely and accurately shown to have been incurred necessarily and by reason of the accident or injuries". He tied "expenses" and "incurred" together to find the necessity for an out-of-pocket disbursement for interest as such.

But this is out of keeping with the general approach. Subject only to demonstrating "definitely and accurately" that the casualty has resulted in injurious consequences to a shipowner, it is "expense" whether it is paid out in cash or is, in a direct operational sense, the economic disadvantage suffered as a result of the casualty. No difficulty is presented by "incurred" since a victim may incur an out-of-pocket expense, a loss without an out-of-pocket disbursement, or both.

To disallow pre-judgment interest in the setting of a scheme to allow substantially the same recovery as under the general maritime law is all the more incongruous since, in the Canal Zone Code, at least seven sections provide for interest.[15]

█ Canal Company, of course, points to § 296 which provides that in any suit following an unsuccessful or unsatisfactory effort to settle, the provisions of § 293 "relative to the determination, adjustment or payment and payment of claims . . . shall apply"

and also the concluding portion which states that the sovereign immunity waiver extends to suits under § 296 and "not . . . otherwise". But we do not base allowance of pre-judgment interest on § 4651 as a statutory ground imported into the structure for claims under § 291 or § 292. Rather, these consistent provisions by Congress in parallel—if not contemporaneous—legislation recognizing the allowance of interest in practically every customary situation is a strong indicator that Congress could not have had the unrealistic approach on confining the allowance of traditional pre-judgment interest to the necessity of the victim showing, as the District Judge held, not only the loss of the use of his money expended for such items as repair bills, but, in addition, some character of a loan or a similar credit device for all or a portion of those expenditures and an express agreement to pay interest thereon.

Pre-judgment interest should have been allowed.

### Duration of Detention and Consequential Damages

█ *Items 1 & 22:*[16] As pointed out above the vessel was out of commission for a total of eleven days as a direct consequence of the rudder damage. The District Court allowed this in full both for the loss of charter hire payable and direct out-of-pocket expenses, increased wages, victualling costs and the like. Canal Company asserts that under § 293, ¶¶ (2) and (3) only 4/11 are allowable "for the time the vessel is undergoing repairs,"[17] since repairs as such took only 4 days.

---

15. Notable is § 4651:
"Section 4651. Recovery of interest on damages. A person who is entitled to recover damages certain, or capable of being made certain by calculation, and the right to recover which is vested in him upon a particular day, is entitled also to recover interest thereon from that day, except during such time as the debtor is prevented by law, or by the act of the creditor, from paying the debt." 76A Stat. 263.
See also Ch. 45, § 1518, (Interest on Special Damages) ; § 4652, (Breach of

Contract) ; § 4653 (Interest Stipulated by Contract) ; § 4683 (Breach of Contract to Pay Liquidated Sum) ; § 4702 (Conversion of Property) ; § 4723 (Damages Exclusive of Interest).

16. Item numbers refer to the claims analysis of Canal Company.

17. Canal Company's brief states without contradiction that from 1918 until the effective date of Executive Order 4314, September 25, 1925 (see note 9, *supra*) the phrase read "for the time a vessel is *tied up* undergoing repairs" (emphasis

Again this is at odds with the goal of substantial parity with general maritime principles and particularly the care with which detention claims are provided for in § 293, ¶¶ (2), (3) and the last unnumbered paragraph which refers generally to "the value of the use of the vessel to its owners in the business in which it was engaged at the time of the injuries shall be used as a basis for estimating the damages for the vessel's detention . . .". Whatever doubt there might be on that score is eliminated by § 293, ¶ (4). Because for a vessel such as the GULFSPRAY, then under charter, the payment of charter hire during the full 11 day period was an "expense" shown to have "been incurred necessarily and by reason of the accident . . .".

■ *Items 2, 3, 4 & 5:* These were expenses for harbor pilotage, launch service, tugs, diver's inspection and wharfage incurred when the vessel returned to the Canal Zone to investigate her rudder damage. These items were disallowed for the curious reason that they were incurred "for the convenience of the vessel owner to find out what his damages were and to prove his claim" and, of course, the general thesis that such claims had never been made before.

For at least two reasons these claims, as the District Court found, fully meet § 293, ¶ (4) as expenses necessarily incurred.

First, with the vessel acting up as she did after leaving Balboa which continued on after she got to sea, the only prudent thing for the master to do was to put back to determine the nature and extent of the damage and whether the vessel could safely proceed to another port for repairs. Failure to have taken such action had something serious thereafter occurred would have opened the master and shipowner to the charge of imprudent action to shift on to shipowner the full burden of such "avoidable conse-

quences". See Southport Transit Co. v. Avondale Marine Ways, 5 Cir., 1956, 234 F.2d 947, 1956 A.M.C. 1498.

Second, had the ship not put back into the Canal Zone their owner may well have lost its entire $110,000.00 claim for failure to comply with the regulation requiring notice, *Gulfspray I.*

■ *Items 12 & 20:* These were travel expenses of three regular employees of Gulf, two for transporting a rudder stock from Pennsylvania to California and another for travel of a Marine inspector from Port Arthur, Texas to California to oversee the repairs. Except for Canal Company's traditional disallowance on some basis either undisclosed or undecipherable, there is not the slightest suggestion why these travel expenses (not wages) of shipowner's regular employees were not "necessarily" incurred by reason of the accident.

■ *Item 18:* This is for the second marine survey performed at shipowner's request. This item was disallowed because it covered the cost of marine survey in addition to the one had on behalf of the classification society (American Bureau Shipping) on the traditional ground that they would only allow one surveyor fee. This is a matter of prudence and there are other interests that need to be protected besides that of the underwriters or the continuation of insurance, not the least of which will be that of the shipowner for its exposure to losses and risks that might not be covered by the hull policy.

The upshot is that the Judge was right in allowing the disputed items, but wrong in disallowing pre-judgment interest. Lest this case get more barnacles as it winds its way to and from New Orleans and the Canal Zone we think, as in *Noah's Ark, supra,* we

supplied). Both "undergoing repairs" and "tied up undergoing repairs" are loose terms to describe the period of time

in which the vessel cannot be profitably employed as a consequence of the casualty.

should modify the decree to award such interest and bring it to an end.[18]

Affirmed in part, modified in part and as modified, affirmed.

18. So that hopefully there will be no *Gulfspray IV* we commit to the District Judge superintendence over the arithmetical computation of the interest and the total final decree.