KANSAS CITY SOUTHERN
RAILWAY COMPANY

v.

BARGE HBC 8106, et al.

Civ. A. No. 83–0026.

United States District Court,
W.D. Louisiana,
Lake Charles Division.

July 25, 1986.

**610**

Joel L. Borrello, Paul O. Dicharry, Adams & Reese, New Orleans, La., for plaintiff.

Edmund E. Woodley, James B. Doyle, Woodley, Barnett, Williams, Fenet & Palmer, Lake Charles, La., for defendants.

OPINION

VERON, District Judge.

This matter was heard by the Court without a jury on April 29, 1986. The Court having heard the evidence, examined the exhibits, pleadings, stipulations, and post-trial memoranda submitted by the parties, now makes the following Findings of Fact and Conclusions of Law as to the damages sustained by plaintiff as a result of the allision of the four defendant barges with the Kansas City Southern Railway's Calcasieu River Bridge on December 29, 1982.

### I. FINDINGS OF FACT

1. The Court expressly adopts and incorporates by reference those Stipulations of Fact entered into by the parties and filed with the Court on April 28, 1986. See Appendix.

2. Following the visit of Louisiana Limestone Aggregate's personnel to the Westlake facility late in the evening of December 26, 1982, no agent nor employee of any of the defendants did anything to

monitor the weather for changing forecasts, to monitor or check the moorings of the four barges, or to move the barges to a safer mooring location.

3. Other mooring locations were available and the M/V TRIPLE R was capable of moving the barges to safer moorings.

4. Despite the weather and flood forecasts, defendants chose to leave their barges secured by moorings which were adequate for only normal conditions.

5. As a result of the flooding waters and inadequate moorings, the four defendant barges broke from the three steel cables which had kept them moored to a willow tree, a cypress stump, and a hardwood tree on the East side of the Calcasieu River across from the Louisiana Limestone Aggregate facility. See Appendix, ¶¶ 11–12.

6. Drifting downriver, the four barges came to strike the KCS Bridge, destroying and/or damaging its 225 foot swing span, its 175 foot East truss span and its supporting piers, and nine 14 foot timber trestle spans. See Appendix, ¶ 10.

7. The Court finds that the fair and reasonable current-day reconstruction costs for the damaged portions of the bridge, according to the 1890's bridge design, is in the amount of $2,397,155.00.

8. While the Court is aware that certain contingencies must be allowed for the unexpected in any large project, such as that which would be involved in reconstructing the damaged KCS bridge, plaintiff offered no evidence whatsoever to support its claim for "contingencies" in an amount equal to ten percent (10%) of the estimated cost of bridge reconstruction. Absent any such evidence, the Court finds five percent (5%) of the current-day reconstruction cost to be a more reasonable amount and further finds that the fair and reasonable amount for contingencies is $119,858.00.

9. The condition of the Kansas City Southern Railway bridge prior to the allision with the four barges was such that various portions of it were severely deteriorated. These deteriorated portions included the diaphragms between the caissons (see Defendants' Exhibit No. 3), portions of the pier work, and the drive machinery. The Kansas City Southern Railway Bridge was an old structure which had minimum upkeep and maintenance performed upon it and which was, at the time of the allision, being used primarily as a switching track. See Appendix, ¶ 24.

10. In accordance with the condition of the bridge on December 29, 1982, as appears from the numerous photographic exhibits received in evidence and the testimony of expert witnesses on behalf of both plaintiff and defendants, the Sverdrup & Parcels current-day estimate of reconstruction costs should be depreciated to reflect the pre-allision value of those portions of the bridge damaged and/or destroyed in the allision, which the Court finds to be $1,610,888.00.

11. The evidence offered by the plaintiff is entirely insufficient for the Court to make any determination as to the present-day value of those bridge portions which remained intact and undamaged after the allision. The Sverdrup & Parcels Engineering Cost Estimate set forth only reconstruction costs "for replacement of the damaged portion of the structure."

12. Moreover, plaintiff claims that it is owed the cost of engineering and construction management in an amount equal to twelve percent (12%) of the estimated cost of bridge reconstruction. The Sverdrup-Parcels Engineering Cost Estimate, however, included no such amount, and the evidence is utterly insufficient to support such an award. The Court finds that any award for purported costs of engineering and management of construction would result in double recovery of damages by plaintiff, and thus rejects this claim.

13. Within one month of the allision, the Kansas City Southern Railway Company made the decision to not repair nor reconstruct any part of the bridge and instead chose to remove the entirety of the remaining bridge structure down to the present mud line. See Plaintiff's Exhibit No. 3. This decision was apparently supported by the minimal use being made of the bridge by Kansas City Southern Railway Company. See Appendix, ¶¶ 24–26. Nevertheless, the damage itself rendered the bridge

"incapable of repair within the bounds of good business judgment." Appendix, ¶ 18.

14. Because the U.S. Coast Guard required the damaged bridge to be removed, Appendix, ¶ 19, removal costs were necessarily incurred. The Court finds that $607,136.00 in costs was reasonably incurred by plaintiff in having the damaged bridge removed. Appendix, ¶ 20.

## II. CONCLUSIONS OF LAW

1. Jurisdiction is vested in this Court pursuant to 28 U.S.C. § 1333 as the complaint states an admiralty and maritime claim within the meaning of Rule 9(h) of the Federal Rules of Civil Procedure.

2. Insofar as the Findings of Fact determined by the Court also constitute legal conclusions, they are incorporated herein.

■ 3. The law is well-established that when a drifting vessel causes damage, an inference arises as a matter of law that the vessel was adrift through negligence. This presumption of negligence is based upon the logical deduction that a vessel found floating loose was improperly moored. *James v. River Parishes Co., Inc.*, 686 F.2d 1129, 1132–33 (5th Cir.1982). The defendants in the case at bar therefore bore the burden of disproving fault by a preponderance of the evidence, and they failed to carry this burden.

■ 4. Nevertheless, the defendants have offered the defense that the allision was an unavoidable accident, or *vis major*, which human skill and precaution could not have prevented. Defendants have failed to carry their heavy burden of persuasion in establishing this defense, however, because they utterly failed to show that the accident in no way resulted from their own lack of due care. *See Petition of M/V ELAINE JONES*, 480 F.2d 11, 18 (5th Cir. 1973).

■ It is well-established that the burden of proving inevitable accident or Act of God rests heavily upon the party asserting such defense, and the party must show that the accident could not have been prevented by "human skill and precaution and a proper display of nautical skills." *James,*

*supra* at 1132; *see The Louisiana,* 70 U.S. (3 Wall.) 164, 18 L.Ed. 85 (1865). The evidence at trial clearly showed that the only attention given to the barges' moorings by defendants during the flood was a cursory inspection made on December 26, 1982. The four barges were secured to the shore by three steel cables, one tied off to a willow tree, another tied off to a cypress stump, and the third tied off to a hardwood tree. In their pre-trial memorandum, defendants admit that "the moorings were obviously inadequate for the actual level of flooding that occurred...." While the defendants contend that they did not anticipate the flood waters to rise so far as they actually did, the evidence adduced at trial clearly showed that absolutely nothing was done after the evening of December 26 by any of their agents or employees to monitor the weather for changing forecasts, to monitor or check the moorings of the four barges, or to move the barges to a safer location. In spite of the weather and flood forecasts, which defendants apparently ignored, defendants chose to leave their barges secured by moorings which were adequate only for normal conditions. See Findings of Fact, ¶¶ 2–4. Obviously, defendants failed to carry their burden of showing that their personnel did "everything which an experienced mariner could do, adopting ordinary caution." *The Union SS Co. v. The New York & Virginia SS Co.*, 65 U.S. (24 How.) 307, 313, 16 L.Ed. 699, 701 (1861).

■ 5. The damages sustained by the Kansas City Southern Railway bridge were clearly caused by the nomadic barges of defendants. The rule in admiralty is well-settled that where a vessel or structure is damaged and repairs are not made, damages are measurable either by the estimated cost of repairs at the time of the allision or by diminution in market value. *See, e.g., Bunge Corp. v. American Commercial Barge Line Co.*, 630 F.2d 1236, 1241 (7th Cir.1980); *United States v. Shipowners & Merchants Tugboat Co.*, 103 F.Supp. 152, 153 (N.D.Cal.1952), *aff'd* 205 F.2d 352 (9th Cir.1953), *cert. denied*, 346 U.S. 829, 74 S.Ct. 51, 98 L.Ed. 353. As the Fifth Circuit has previously recognized, "[t]here can be

no quarrel with the text authorities to the effect that the cost of repairing or restoring the bridge is generally the proper measure of damages for injury to it." *United States v. State Road Department of Florida,* 189 F.2d 591, 596 (5th Cir.1981); *see also United Overseas Export Wines, Inc. v. Medluck Compania Maviera, S.A.,* 785 F.2d 1320, 1327 (5th Cir.1986).

■ 6. A party suffering injury to his property, however, is entitled to no more than restoration to its condition prior to the wrong. *See, e.g., The Baltimore,* 75 U.S. (8 Wall.) 377, 386, 19 L.Ed. 463 (1869); *Petition of M/V ELAINE JONES, supra,* 480 F.2d at 27; *TUG JUNE S v. Bordagain Shipping Co.,* 418 F.2d 306 (5th Cir. 1969).

As a practical matter, repair may leave property in a better condition. Depreciation, which in terms of a declining dollar figure reflects the annual depletion of an item's continuing usefulness for a given purpose, then becomes a handy tool to reduce the recovery for repair costs to the level necessary to return the injured party to the economic position in which he was found. *Petition of M/V ELAINE JONES, supra,* 480 F.2d at 27.

Thus, the legal measure of damages for rebuilding and repairing the KCS Calcasieu River Bridge is the cost of restoring the bridge to its condition immediately prior to the allision of December 29, 1982, which amounts to $1,610,888.00 in accordance with the Finding of Facts set forth above. Finding of Fact, ¶ 10.

■ 7. In addition to the depreciated value of the damaged portions of the KCS bridge, plaintiff furthermore seeks the entirety of the costs of demolishing and removing the undamaged portions of the bridge structure as well as removing the debris of those portions which were damaged or destroyed in the allision of December 29, 1982. Certainly, the expenses which naturally and reasonably follow from any injury to property are proper items of recovery, *United States v. State Road Department of Florida, supra,* 189 F.2d at 596. Because the U.S. Coast Guard required that the damaged bridge be removed, Appendix ¶ 19, the total cost in the

amount of $607,136.00, reasonably incurred by plaintiff in removing the bridge structure is properly recoverable.

■ 8. Although an award of prejudgment interest "is well-nigh automatic in suits in the admiralty," *Masters v. Transworld Drilling Co.,* 688 F.2d 1013, 1014 (5th Cir.1982), the Court finds that the circumstances of this case would make it inequitable for the defendants to pay prejudgment interest on the cost of restoring the bridge to its condition immediately prior to the allision. Prejudgment interest, as part of the loss itself, is awarded to a victim who has incurred out-of-pocket cash expenses and/or a loss of use of its property. *Gulf Oil Corp. v. Panama Canal Co.,* 481 F.2d 561, 571 (5th Cir.1973). In the case at bar, however, plaintiff failed to prove any "economic disadvantage suffered as a result of the casualty." *See id.*

■ Plaintiff incurred no expenses whatsoever in repairing and replacing the bridge, and offered no proof as to any consequential loss suffered from the allision apart from removal costs. Moreover, the Court gives some consideration to the wide variance of values placed on the bridge by the plaintiff itself. In its 1980 appraisal of the replacement value of the "Calcasieu River Bridge," the plaintiff quoted the replacement value of the bridge at 1.281 million dollars. In its 1982 appraisial, it quoted the replacement value of the bridge at 1.916 million dollars. These values were substantially appreciated from the Interstate Commerce Commission's 1900 evaluation of the bridge at $94,628.48. In addition, the Court also has considered the stipulated-to fact that "[t]he primary need for the KCS bridge ... was for switching purposes, and no mainline scheduled trains used it...." Appendix, ¶ 24. Furthermore, there was only one bridge tender employed for the operation of the bridge at the time of the accident and he was terminated on the morning of the allision. As such, plaintiff has not shown any economic disadvantage suffered from the allision, and the amounts awarded plaintiff by the Court herein fully and fairly compensate plaintiff for its loss. Under the particular circumstances described, an

award of prejudgment interest on the value of the lost bridge is not warranted.

■ 9. Plaintiff is certainly entitled, however, to prejudgment interest on the loss it suffered in being required to pay for the bridge demolition, site clearance and debris removal. Unlike its loss of a little-used bridge, the removal costs clearly constituted an "expense" incurred by the plaintiff. As such, plaintiff is to be awarded prejudgment interest on the amount of removal costs accruing from the date of the allision, *see Ryan Walsh Stevedoring Co. v. James Marine Services, Inc.*, 792 F.2d 489, 492–93 (5th Cir.1986), and the Court finds an interest rate of 10% per annum to be fair and equitable.

### JUDGMENT

For written reasons assigned this day, it is hereby

ORDERED, ADJUDGED AND DECREED that judgment enter in favor of plaintiff against the defendants *in solido*, in the amount of $2,218,024.00, plus prejudgment interest at the rate of ten percent (10%) per annum on the amount of $607,-136.00 accruing from December 29, 1982 until the date of entry of this judgment, with post-judgment interest to run on the total amount in accordance with 28 U.S.C. § 1961.

### APPENDIX

### THE KANSAS CITY SOUTHERN RAILWAY COMPANY

### VERSUS

### BARGES HBC 8106, ET AL

### CONSOLIDATED WITH

### SOUTHERN PACIFIC TRANSPORTATION COMPANY

### VERSUS

### M/V LADY JUDY, ET AL

Civil Action Nos. 83–0026, 83–0064

April 28, 1986

### STIPULATIONS

1. The KCS Calcasieu River Bridge was built in the 1890's.

2. Louisiana Limestone Aggregates, Inc. (LLA) operated the barges HBC 8106, HBC 7985, HBC 7854X, and HBC 7969X at LLA's Westlake facility.

3. The four barges, all laden with limestone as cargo, were moored on the east bank of the Calcasieu River as of December 26, 1982, approximately one-half mile upstream from the KCS Bridge. Some of these barges had been in place since October 15, 1982. The fleeting area in question had been in use in the same fashion by LLA since 1973.

4. The four barges were secured to the shore by three steel cables.

5. On the date of the accident which is the subject matter of this litigation, the LLA vessel "Triple R" had moved a laden barge from the fleeting area west across the Calcasieu River to the unloading dock. This 400 horsepower boat had no trouble maneuvering either itself or its load across the river. Its last trip across the river occurred at 6 P.M. on the 28th of December.

6. Other barges operated by LLA had broken free from the same mooring location previously resulting in damage to the KCS Bridge but none had involved the breaking of steel cables. One prior breakaway involved laden barges and two involved empty barges.

7. Other collisions or allisions with the KCS Bridge had also occurred over the years from other companies' vessels. The damage caused by these collisions was not always repaired.

8. On December 26, 1982, LLA personnel visited the Westlake facility to check on the mooring of the barges in response to LLA's local sales representatives's concerns about the reports of adverse weather in the area.

9. The barges broke free of their mooring on or about midnight, December 28, 1982.

10. Upon breaking out, the barges struck the KCS Bridge displacing the mov-

able-span (center span) turntable into the waterway, shearing the guidewall and dislocating the bridge support pier in the eastern approach.

11. Post-accident investigation revealed that the shorelines had parted under pressure.

12. Post-accident observation indicated that river current was running faster and water levels were higher at the time of the breakaway than at the time the mooring was checked on December 26, 1982 or at the last time LLA personnel observed the currents and water levels prior to the breakaway.

13. On December 26, 1982, the National Weather Service (NWS) forecast "two to three foot overbank flooding might be expected ... along ... Calcasieu River from headwaters downstream to Lake Charles area."

14. On December 26, 1982, the NWS forecast a river crest of 3.0 to 3.5 feet above flood stage at the U.S. Army Corps of Engineers (COE) Salt Water Barrier for December 30, 1982. The Salt Water Barrier is approximately one mile upstream from the LLA Westlake facility.

15. On December 27, 1982, the NWS forecast increasing flooding "along the entire Calcasieu River ... flood crests will approach near record flood."

16. The flood along the Calcasieu River in late December, 1982 followed a 100–year rainfall event December 25–28, 1982.

17. COE records indicate the following water levels at the Salt Water Barrier Channel:

| Date (8 A.M.) | Water Level (Mean Low Gulf) |
| --- | --- |
| 12/25/82 | 3.15 |
| 12/26/82 | 3.29 |
| 12/27/82 | 4.56 |
| 12/28/82 | 5.02 |
| 12/29/82 | 7.35 |

18. The damage to the KCS Bridge rendered it incapable of repair within the bounds of good business judgment.

19. The U.S. Coast Guard required that the damaged bridge be removed.

20. If called to testify, the personnel of Coastal Construction Company would testify that the costs incurred by the KCS in removing the damaged KCS Bridge totalled $607,136.00, representing demolition, site clearance and debris removal (including labor, heavy equipment, explosives, diving and salvage operations, and services of professional engineering personnel, consumable equipment), all of which costs were reasonably incurred in the removal effort.

21. Sverdrup & Parcel and Associates, Inc., Engineers-Architects-Planners, of St. Louis, Missouri prepared a Preliminary Engineering Cost Estimate of a Replacement Structure for Kansas City Southern Railroad Bridge over the Calcasieu River at Lake Charles, Louisiana (the Sverdrup Report). Said Report provided a current-day estimate of reconstruction costs according to the 1890's design and resulted in an estimated construction cost of $2,637,-000.00.

22. The KCS's experts, Gibbs & Hill, Inc. of Dallas, Texas, derived an estimated construction cost for a replacement meeting modern design standards and specifications of $6,600,000.00.

23. The KCS's insurers paid the KCS the sum of $4,060,072.00 representing payment in full for:

a) $3,553,936.00 as replacement value of the KCS Bridge, based upon the Sverdrup Report, adjusted to include additional cost items for cofferdamming and pier reconstruction.

b) $607,136.00 for actual demolition costs incurred.

24. The KCS had constructed new yard facilities prior to the accident near Mossville. That construction gave KCS the capability of moving its mainline traffic through its route system without the necessity of crossing the Calcasieu River. After this yard opened, serious consideration was given to the closing and demolition of the KCS Bridge, although this had been considered on various occasions dating back to the 1950's. The primary need for the KCS Bridge after the opening of the Mossville yard was for switching purposes, and no

mainline, scheduled trains used it after that date.

25. In 1979 and 1980, the KCS partially rehabilitated the KCS Bridge in lieu of a proposed joint-trackage agreement with the Southern Pacific Transportation Company, after negotiations with the SP proved fruitless.

26. Only one bridge tender was employed for the operations of the KCS Bridge at the time of the accident. His normal work hours were 10:00 A.M. to 6:00 P.M., Monday through Friday. At all other times, the swing span of the bridge was left open to marine traffic. On the morning of the accident, this bridge tender was terminated by the KCS.

Respecfully submitted,
WOODLEY, BARNETT, WILLIAMS, FENET, PALMER & PITRE
BY: /s/ James B. Doyle
JAMES B. DOYLE
Attorneys for Defendants
ADAMS AND REESE
BY: /s/ Joel L. Borrello
JOEL L. BORRELLO
PAUL O. DICHARRY
Attorneys for Plaintiffs and Intervening Plaintiffs