AFRAN TRANSPORT COMPANY, as Owner of the S/S CABIMAS, Plaintiff-Appellee,

v.

The S/S TRANSCOLORADO, Hudson Waterways Corporation, Defendant-Appellant,

Panama Canal Company, Defendant-Appellee.

No. 71–1834

Summary Calendar.*

United States Court of Appeals, Fifth Circuit.

April 3, 1972.

* [1] Rule 18, 5 Cir.; See Isbell Enterprises, Inc. v. Citizens Casualty Co. of New York et al., 5 Cir., 1970, 431 F.2d 409.

Max Taylor, New York City, Roy Phillipps, Balboa, Canal Zone, Burke & Parsons, New York City, for defendant-claimant and counter-claimant, appellant.

DeCastro & Robles, Balboa, Canal Zone, Joseph C. Smith, New York City, for Afran; James W. Fry, Jr., and Burlingham, Underwood, Wright, White & Lord, New York City, of counsel.

Dwight A. McKabney, John L. Haines, Jr., Balboa Heights, Canal Zone, for Panama Canal Co.

Before JOHN R. BROWN, Chief Judge, and INGRAHAM and RONEY, Circuit Judges.

JOHN R. BROWN, Chief Judge:

This appeal arises from the collision of the tanker S/S Cabimas and the freighter S/S Transcolorado in the Atlantic entrance channel to the Panama Canal. The Trial Court, D.C., 321 F. Supp. 546, found S/S Transcolorado solely at fault for the collision for having failed to keep a proper lookout and having failed to keep clear of the Cabimas as she was required to do by the Canal Zone Rules of navigation.

The setting is quite simple. S/S Transcolorado, a cargo ship, was at anchor in Colon Harbor. After completion of bunkering she intended to swing out into the main channel of the canal and head substantially north out to sea through the channel entrance breakwater. No pilot was required or aboard. The channel runs substantially north-

south and is 500 feet wide. S/S Cabimas, a large tanker, was at anchor in Limon Bay approximately one mile above (and slightly to the west of the channel). With Captain Rourke, a Panama Canal Company pilot, conning the ship, her intention was to swing out into the channel to a course of approximately 180° for this leg of her canal transit.

S/S Transcolorado, on weighing anchor, was heading southeast. Because of anchored vessels and some buoys nearby, her master determined it best to come astern on the engines to start her swinging to the right to be followed by ahead movement on the engines to accelerate the swing to a northwesterly heading in order to enable her to straighten up in the channel on a northerly course.

The explanation for the collision is equally simple. Each vessel continued on with her planned maneuvers completely indifferent to what the other was doing until, in the jaws of collision, each undertook belated but ineffective action accompanied by the sounding of whistles that could then but herald the impending impact.

S/S Transcolorado, sighting S/S Cabimas coming down the channel and assuming she would continue southbound, continued her swinging movement to the right without thereafter paying any heed to the position of S/S Cabimas until it was too late. In the meantime she had encroached upon the canal—probably as much as 200 feet—almost to the center of the channel. S/S Cabimas, on the other hand, with a pilot who was unconcerned about the master's concern about what the maneuvering S/S Transcolorado was doing, kept on headlong at a speed of 6.36 knots made good in the belief that the maneuvering S/S Transcolorado would recognize the privileged [1]

status of the downbound S/S Cabimas with the same fervor as that held by her pilot Rourke.

The Trial Court, on a record of deposition testimony only, held—with no surprise to anyone save S/S Transcolorado —that she was clearly at fault for having failed to keep a proper lookout and for having failed to keep clear of S/S Cabimas as was the duty of the burdened vessel. The Court, however, exonerated S/S Cabimas. S/S Transcolorado with optimism born of hope seeks by this appeal to escape altogether, knowing that if that tactic fails, there is always the anchor-to-windward-chance that with a whole loaf not available, half a loaf will do.

■ For faults as glaring as revealed and found, S/S Transcolorado's effort to float away free both fails and needs no elaboration. This is true whether approached as a contention that she did nothing wrong or, as more seriously urged, as a water-born application of the land-based notion of Last Clear Chance. The doctrine has enough buoyancy to float in a maritime case, Cenac Towing Co., Inc. v. Richmond, 5 Cir., 1959, 265 F.2d 466; Arthur-Smith Corp. v. Gulf States Marine & Mining Co., 5 Cir., 1958, 258 F.2d 499, but in collision situations—unlike common law incidents where two strangers are involved—in which each vessel has duties toward the other that are formally well defined and known, the one who is put to a sudden choice of action to avoid hazard created by the patent fault of the other has considerable latitude. The choices of stopping engines or going ahead, going to port rather than starboard, are to be judged not by an armchaired admiral, United Geophysical Co. v. Vela, 5 Cir., 1956, 231 F.2d 816, who has hours, days,

---

1. Try as she might, S/S Transcolorado cannot escape the precision and force of Rule 145(d), Canal Zone Regulations, which specifically accorded to S/S Cabimas the privileged status and imposed on S/S Transcolorado that of the burdened vessel. 35 CFR § 111.145(d) provides:

"(d) A power-driven vessel or sailing vessel or motorboat that is entering or preparing to enter the main channel of the Canal from either side shall not cross the bow of a vessel proceeding in either direction along the Canal axis and shall keep clear until the vessel proceeding along the Canal axis has passed."

weeks, months or years to reflect, but in the light of choices suddenly forced on by the neglect of the one now seeking total absolution. For, "errors in judgment committed by a vessel put in sudden peril through no fault of her own are to be leniently judged." Union Oil Co. of California v. Tug Mary Malloy, 5 Cir., 1969, 414 F.2d 669, 674. All S/S Transcolorado can urge on this score is that S/S Cabimas should not have gone astern on her engines and dropped her port anchor—which pulled her over into the east half of the channel—but should have swung starboard and held her speed. The errors of judgment were not so glaring that all should be put on S/S Cabimas. "The piercing searchlight of hindsight * * * may point to other maneuvers that might have been taken. * * * However, both we, and the [Trial] judge must interpret the record from the viewpoint of a prudent pilot under the circumstances then and there existing. * * * Conduct must be judged with reference to the circumstances at the time and not by a cool estimate of possible danger which might be formed after the event." China Union Lines, Ltd. v. A. O. Anderson & Co., 5 Cir., 1966, 364 F.2d 769, 779, 1966 A. M.C. 1653, 1664, cert. denied, 1967, 386 U.S. 933, 87 S.Ct. 955, 17 L.Ed.2d 805.

But S/S Cabimas does not come out so well to the mutual fault challenge that she must bear some—not all—responsibility. This outcome, however, is not reached because, as S/S Transcolorado claims, the Judge erred in considering S/S Cabimas a privileged vessel under Rule 145(d) (note 1, *supra*). We reject

this quickly since it rests on the notion that for her to be privileged, her course, as reflected by the course recorder, had to be 180° instead of being, as S/S Transcolorado reads it, more in the neighborhood of 174°. This is a law office armchair afterthought since none on S/S Transcolorado really had any thoughts that the southbound vessel intended anything other than a continuation down the channel. Moreover, the privileged status is not forfeited merely by varying from the strict axis of the Canal. The Rule (note 1, *supra*) accords the privilege to a vessel "proceeding * * * along the Canal axis." Until the last moment efforts of S/S Cabimas she never varied substantially from that.

Technically perhaps, S/S Transcolorado gets an assist for its attack on the Judge's finding that the "S/S Transcolorado suddenly entered the Canal channel"[2] and his conclusion that "the moment of decision presented itself suddenly and unexpectedly."[3] For crediting fully Pilot Rourke's testimony, it is certain on his own contemporary estimate of the situation that neither of these things occurred. But this just sets the stage. To get affirmative fault against S/S Cabimas, S/S Transcolorado must point to some error other than the last minute veering to port instead of swinging to the right with the engines kept ahead, not put astern. On this attack she contends principally that S/S Cabimas ought to have sounded a danger signal under Canal Zone Reg. § 111.153(b).[4] Emphasis to this attack is

2. Finding of Fact 11.

3. Conclusion of Law 3.

4. § 111.153 provides,
"(a) When vessels are in sight of one another, a power-driven vessel or motorboat underway, in taking any course of action, other than as provided in § 111.151, authorized or required by these rules, shall indicate that course by the following signals on her whistle, namely:
One short blast to mean "I intend to pass you on my port hand."

Two short blasts to mean "I intend to pass you on my starboard hand."

Three short blasts to mean "My engines are going astern."

The other vessel shall promptly answer a one-blast or two-blast signal with a similar blast of her whistle, unless passage in the manner proposed would be dangerous or the course or intention of the first vessel is not understood. In either such case, the other vessel shall sound the danger signal. Thereafter both vessels shall proceed with caution

given from the Judge's failure to make any finding one way or the other. Additionally, she criticizes S/S Cabimas for not holding course and speed as ordinarily exacted of the privileged vessel.[5] Although not urged specifically, we think these charges and the surrounding circumstances call for us to measure credited portions of the record against the demands of the Special Circumstances [6] and General Prudential [7] Rules.

Pilot Rourke never lost sight of the maneuvering S/S Transcolorado. Yet only three things were clear in his mind: (i) he intended to continue on southbound, (ii) he assumed S/S Transcolorado would not come out into the Canal channel, (iii) but he did not really know what S/S Transcolorado was going to do.[8]

Although Pilot Rourke perhaps would— but really did not—disclaim concern, the

until new agreement is reached or danger of collision has passed.

(b) Whenever a power-driven vessel or motorboat is in sight of another vessel and is in doubt whether sufficient action is being taken by the other vessel to avert collision, she shall indicate such doubt by giving the danger signal. The giving of such a signal shall not relieve a vessel of her obligations under § 111.3 or § 111.4 or any other section, or of her duty to indicate any action taken under these sections by giving the appropriate sound signals laid down in this section.

(c) Failure to give or receive any of the whistle signals required by this section shall not lessen the duty of both vessels to pass each other as herein prescribed, except when emergency action becomes necessary as provided in § 111.3."

5. See Canal Zone Reg. § 111.147.
"Where by any of the provisions in this part one of two vessels is to keep out of the way, the other shall keep her course and speed. When, from any cause, the latter vessel finds herself so close that collision cannot be avoided by the action of the burdened vessel alone, the privileged vessel also shall take such action as will best aid to avert collision. The vessel having the right-of-way shall in no case take any action that would unnecessarily endanger the burdened vessel; shall give due regard to existing circumstances; and shall proceed with caution so long as danger of collision remains."

6. Canal Zone Reg. § 111.3.
"Departure from rules authorized in special circumstances.
In obeying and construing the provisions of this part due regard shall be had to all dangers of navigation and collision, and to any special circumstances, including the limitations of the craft involved, which may render a departure from any of such provisions

necessary in order to avoid immediate danger."

7. Canal Zone Reg. § 111.4.
"Precautions required by ordinary practice of seamen or by special circumstances.
Nothing in this part shall exonerate any vessel, or the owner, master or crew thereof, from the consequences of any neglect to carry lights or signals, or of any neglect to keep a proper lookout, or of the neglect of any precaution which may be required by the ordinary practice of seamen, or by the special circumstances of the case."

8. Rourke's testimony was as follows.
"Q. You never blew the danger signal?
A. I did not.
Q. Why not?
A. I had no idea that this ship once she had maneuvered in this manner and saw me coming up the channel, which she must have seen, a ship this size * * I had no idea that he would come across the channel or come into the point where the ships would be in extremist. He had been maneuvering with the stern bells and the head bells; we had been in the channel, and I thought this was obvious. * * * I didn't think he would come across the channel, and I didn't think there was any danger involved. (R. 106).
* * * * *
Q. Okay. Now, when you first saw the TRANSCOLORADO, did you know where she was going?
A. I did not, sir. I saw her stern.
Q. But you were concerned about her movements, as to where she might go?
A. I was concerned that if she went to Cristobal harbor she might come out.
* * *
Q. Were you concerned that the TRANSCOLORADO might come into the channel and proceed north out to sea?
A. No, I wasn't. (R. 118).
* * * * *

master of S/S Cabimas did not. He had earlier expressed concern to which the pilot replied, "Don't worry about him." The master then entered a note in the log [9] and later extended this in the form of a "reserved" protest in the log.[10]

■ We may assume that Pilot Rourke had a right to assume initially that S/S Transcolorado would (i) see the southbound S/S Cabimas and (ii) would not cross her bow or fail to keep clear. § 111.145(d). But on her own story, S/S Cabimas saw 10 minutes before collision that S/S Transcolorado was heading toward the channel and at a course perpendicular to the channel. There is nothing in the record—which is before us wholly on deposition, affording no room for credibility choices by the Trial Court—to indicate that from that moment on until 0752 (collision time 0755) those on S/S Cabimas saw anything about S/S Transcolorado's actions which would indicate that she would not continue on this apparent crossing course. This suggests strongly that prior to 0752, S/S Cabimas should have known that actions of the burdened

Q. * * * Now, did you feel that she might be going north or that she might be going south.
A. I didn't know, sir. (R. 119).
* * * * *
Q. But, it was a good ten minutes before collision that you were so concerned about the TRANSCOLORADO that you called the Canal Control and asked them what the TRANSCOLORADO was doing?
A. I would say so, yes. (R. 121).
* * * * *
A. My conception at that point was that he was going to maneuver himself around until he was square and wait for me to get past then go. * * *
Q. Well what alternatives would he have at that time?
A. Well, he was maneuvering because he was in close. I saw that he was maneuvering. He had no alternative but to wait until I passed, then proceed about his business. * * *
Q. * * * In other words, from your experience you would know that this vessel was going to go north or south, but you thought she wouldn't do that because of what you say the rules were?
A. No, I felt that she would wait for me to be clear and then proceed. (R. 131).
* * * * *
Q. * * * or you had a pretty good idea that this was a vessel whose eventual intentions were to go either north to the Atlantic or south to the Pacific?
A. * * * I thought she was going to shift her anchors in Colon harbor. She could possibly be coming over here to anchor, to find the collector for bunkers, or she could be going to sea, but, in any event, of the three possibilities * * *

Q. But that was one of the factors that she might have in mind, namely, to go to sea?
A. This could very well be, sir. (R. 132).
* * * * *
Q. You told us before that you were in position 3–A, which you estimated was approximately 2000 feet from the point of collision, when you realized that she was going to try to cross your bow.
A. * * * But this fellow was maneuvering, he was going astern and ahead. * * * It never entered my mind that he would come out into the channel. I assumed he would maneuver himself into a position where he could wait for me to get past, and this is all I can say. (R. 133).
* * * * *
Q. But, you didn't blow a danger signal?
A. No, I didn't sir. * * * My realization of his intention was that he was going to maneuver, wait until I passed and get himself into position to do whatever he intended to do." (R. 135).
* * * * *

9. "At 0744 observed the S/S Transcolorado coming from our port side crossing our course." Finding of Fact 24.

10. " * * * I reserve to send protest to the Panama Canal Authorities, and I reserve to claim for repairs delays and other expenses connected with the collision, calling the Panama Canal also responsible, being my ship was under Panama Canal Pilot advices."
This may amount to nothing but an anchor-to-windward as a condition precedent to claim against the Panama Canal Company. See Gulf Oil Corp. v. Panama Canal Co., 5 Cir., 1969, 407 F.2d 24.

S/S Transcolorado could not alone avert collision and thus put on her the duty of taking evasive action as Rule § 111.147 (note 5, *supra*) expressly calls for by language which is essentially a paraphrase of §§ 111.3 (note 6, *supra*) and 111.4 (note 7, *supra*).

But we need not focus on prior times for we think that on the uncontradicted testimony of Pilot Rourke and the Trial Court's express findings, the actions of S/S Cabimas did not satisfy § 111.153(b) (note 4, *supra*) or §§ 111.3, 111.4. At approximately 0752, S/S Cabimas knew for sure that S/S Transcolorado was heading substantially across the channel. At that moment, Pilot Rourke fixed the location of his ship at 1800 to 2000 feet above collision point.[11] Although Pilot Rourke several times testified that within 500 to 600 feet—a ship's length—he had ordered (i) full astern, (ii) blowing astern signals and (iii) dropping an anchor,[12] the Trial Court found that "when about 600 feet from the point of collision" S/S Cabimas took these actions.

Considering her speed and the now certain knowledge of S/S Transcolorado's actions, no plausible excuse—indeed no excuse—is or can be offered as to noncompliance with the demands of §§ 111.3 and 111.4. Indeed, the Court made no findings on this. And to this must be added the failure to sound the danger alarm as § 111.153(b) calls for when a vessel (S/S Cabimas) "in sight of another vessel" (S/S Transcolorado) is "in doubt whether sufficient action is being taken by the other vessel to avert collision. [S]he shall indicate such doubt by giving the danger signal * * *."[13]

Actually, the District Court did not even make a finding on either the absence of quicker action or the failure to sound the alarms. Considering that S/S Transcolorado, from the time she commenced her swinging astern movement (14 minutes before collision) paid no attention to and did not thereafter even see the downbound S/S Cabimas,[14] the Court could not silently assume that the alarm would not have served a purpose in alerting S/S Transcolorado to the urgency of the situation. At least the heavy burden was on S/S Cabimas to establish that it could not. "When a plain statutory command is violated * * * [the vessel] cannot escape the consequences because fault of the other may be more glaring, more flagrant, or more shocking. Her last clear chance to extricate herself is to show that the statutory fault not only did not, but could not possibly have, caused collision." O/Y Finlayson-Forssa A/B v. Pan Atlantic S/S Corp., 5 Cir., 1958, 259 F.2d 11, 22, cert. denied, 1959, 361 U.S. 882, 80 S.Ct. 153, 4 L.Ed.2d 119.

What misled the Judge was, we think, an overreliance on the findings of the Board of Local Inspectors of the Canal Zone Government. He was, of course,

---

11. This was repeated at least three times on cross-examination.

12. The pilot simply ordered the anchor let go which the master simply translated into Italian and relayed to the fo'c'sle head where, uninstructed as to which anchor, the officer executed by dropping the port anchor. This caused S/S Cabimas to veer sharply to port. There was no contemporary rational choice exercised by either pilot or master although each in retrospect finds good reasons for the mate's choice.

13. S/S Transcolorado argues that under § 111.153(a) the danger signal was required because the "course or intention of" S/S Transcolorado was not known to S/S Cabimas. We need not assay that specific argument since under § 111.153(b) the doubt whether sufficient action is being taken to avert collision may operationally comprehend *doubt as to course or intention.*

14. See Finding of Fact 8.
"Prior to getting his vessel underway, Captain Carcich [of S.S Transcolorado] surveyed the harbor area and observed the Cabimas near the Atlantic breakwaters proceeding on a southerly course. Neither he nor anyone else aboard the Transcolorado noticed the Cabimas again until the collision was imminent. The Transcolorado was equipped with large kingposts which obstructed the view forward of persons standing in her wheelhouse."

entitled to receive and consider the report and findings [15] somewhat like his English Brothers would the assistance of the Elder Brethern of Trinity House. But examination of the Board's findings and conclusions shows that it did not consider or make findings on these crucial matters.[16]

What the Judge did was to adopt and paraphrase the Board's conclusory finding [17] on the not unnatural ground of the Board members' professional expertise. But we reject the Board's finding not because it was not declared by Judges—whose commission confessedly does not necessarily assure them of omni-prescience—but because the report fails to treat, assay or make findings on crucial questions.

The result is that S/S Transcolorado is half right so the decree must be modified to find mutual fault.

Modified and remanded.

---

15. Luckenbach Steamship Co. v. Panama Canal Co., 5 Cir., 1967, 380 F.2d 31. Cf. The Abangarez, D.C.La., 1932, 60 F.2d 543.

    See also Victorias Milling Co. v. Panama Canal Co., 5 Cir., 1959, 272 F.2d 716.

16. After finding S/S Transcolorado at fault, the Board's "opinion" continues, "3. That there was no fault on the part of the master or crew of the Cabimas.

4. That there was no fault on the part of the pilot of the Cabimas, Captain R. F. Rourke.

5. That there was no fault on the part of any other Panama Canal Company employee."

17. Conclusion of Law 6.
    "6. There was no fault on the part of the Cabimas, her Panama Canal Pilot, Rourke, nor anyone else on board the Cabimas, which contributed in any manner whatsoever to the collision."