**MAGNOLIA MARINE TRANSPORT, et al.**

v.

**Barbara B. FRYE, et al.**

**Civ. A. Nos. 89–1361, 90–3053 and 91–2086.**

United States District Court, E.D. Louisiana.

Sept. 13, 1994.

---

Frank J. Dantone, Henderson Dantone, P.A., Greenville, MS, for plaintiffs.

Peter L. Hilbert, Jr., Darnell Bludworth, McGlinchey, Stafford, Lang, New Orleans, LA, for defendants.

MENTZ, District Judge.

## FINDINGS AND CONCLUSION

### I. *Background*

On February 3, 1988, the harbor tug M/V SAM LEBLANC (SAM LEBLANC) travelling southbound on the Mississippi River, collided with the tow of the northbound M/V ERGONOT (ERGONOT). Both vessels were traveling in shut out fog in the Baton Rouge Harbor. Upon impact with the ERGONOT, the SAM LEBLANC proceeded toward the west bank of the Mississippi and collided with the tow of the northbound M/V POINTE COUPEE (POINTE COUPEE), which the ERGONOT was in the process of overtaking. Upon impact with the POINTE COUPEE, the SAM LEBLANC reversed into the west bank of the river where it collided with a fleet barge and was grounded.

Following this incident, two of the three crew members aboard the SAM LEBLANC were rescued; however, the captain, Joseph Frye, was never found and is presumed drowned.

Barbara Frye as Administratrix of the Estate of Joseph Frye filed suit against Magnolia Marine Transport Co. (Magnolia), the owner and operator of the ERGONOT, and against E.N. Bisso, Inc. (Bisso), employer of Mr. Frye and the owner and operator of the SAM LEBLANC. Both Magnolia and Bisso filed limitation of liability petitions. Magnolia brought in as third party defendants both Pointe Coupee, Inc. and Eckstein Marine Company (Pointe Coupee and Eckstein), the owner and demise charterer of the POINTE COUPEE, respectively.[1] Subsequently, Pointe Coupee and Eckstein also filed a petition for limitation of liability. All claims have been settled between all parties excepting the claim of Magnolia against Pointe Coupee and Eckstein.

The sole issue before the Court at this juncture is whether or not Pointe Coupee and Eckstein are entitled to exoneration of all liability concerning the death of Joseph Frye.

It was stipulated between the parties that should the Court find that Pointe Coupee and Eckstein are not entitled to exoneration, both Pointe Coupee and Eckstein would be entitled to limitation of liability to the post accident value of the POINTE COUPEE, which was two hundred twenty-five thousand dollars ($225,000) plus her pending freight, which was eleven thousand three hundred sixty-one dollars and thirty cents ($11,-361.30), plus interest at the Louisiana legal rate of interest.

The Court is aware of the discrepancies as to the SAM LEBLANC/ERGONOT passing agreement between the testimonies of Pilot Dedmon of the ERGONOT and Captain Deshotel of the POINTE COUPEE, and that Deshotel died of natural causes subsequent to the accident and prior to trial. However, for the purposes of this trial, the Court is concerned with the perceptions of Captain

---

1. Magnolia also named Laplace Towing Corporation as a third party defendant, which shall be addressed further below.

Deshotel as reflected in his statement to the Coast Guard the day of the accident and his sworn statement taken the day after the accident, and in what he did or failed to do which could have contributed to the casualty.

The Court, having reviewed all of the evidence, including deposition testimony [2], exhibits and oral testimony, now makes its findings of fact and conclusions of law.

To the extent that any of the following findings of fact are legal in nature, they are incorporated herein as conclusions of law, and to the extent that any of the legal conclusions recited below contain factual findings, they are adopted as such.

## II. *Findings of Fact*

### A. *The Parties*

On the date of the accident, February 3, 1988, Magnolia was the owner and/or operator of the ERGONOT, and its tow, the barges MM12 and MM28.

Pointe Coupee was the owner of the POINTE COUPEE and Eckstein was the demise charter of the POINTE COUPEE. Laplace Towing Corporation did not own or operate the POINTE COUPEE.

### B. *The Vessels*

The ERGONOT's official number is 260866. It is a twin screw push boat, approximately 83 feet long by 24 feet wide. Built in 1951 by Nashville Bridge Company, the ERGONOT was re-powered in 1974 developing approximately 1130 horse power (h.p.). The ERGONOT was operating as a "unit tow" with Barges MM12 and MM28 strung out end to end in front of the boat with a total length including boat of approximately 658 feet. Both barges were loaded at the time of the collision and both carried certificates of inspection by the Coast Guard. On the morning of February 3, the ERGONOT was traveling upriver, at approximately three to four miles per hour. All mechanical and electrical equipment on the ERGONOT was functioning properly.

The POINTE COUPEE, official number 559350, was built in 1974, and is an approximately 68 foot long twin screw towboat developing 1350 h.p. On the morning of February 3rd, the POINTE COUPEE had four barges in tow, with three strung out end to end in front, and one bound to the starboard side of the second barge, with a total length including boat of approximately 660 feet and a total width of 70 feet. A tank barge 196 foot by 35 built in 1974 with a draft of 9 feet, the DM946, was the lead barge in the POINTE COUPEE's tow and was loaded with the volatile red flag cargo, ether. Barges DM2802, DM602, and NMS1485 were also loaded with cargo. The speed of the POINTE COUPEE was between 1 and 1.5 miles per hour.

The SAM LEBLANC, official number 202806, was a diesel powered, single engine harbor tug 93.7 foot long. Developing 1800 h.p., the SAM LEBLANC was rebuilt in 1983. At the time of the accident, it was traveling "lightboat" or without a tow, and was thus the more maneuverable of the three vessels.

The vessels involved were navigating on the lower Mississippi River in proximity to the I–10 Bridge, in or near the Port of Baton Rouge. In the area just above the I–10 Bridge where the accident occurred, the Mississippi River is in excess of 1800 feet wide.[3]

Immediately before the collision, the ERGONOT and the POINTE COUPEE were northbound on the river, and the SAM LEBLANC was intended southbound.

### C. *Vessel Crews*

At the time of the incident the ERGONOT was being piloted by pilot Charles Dedmon, who had relieved Captain Kenny Brones several minutes earlier.

The crew of the POINTE COUPEE consisted of Captain Richard Deshotel, pilot

---

2. Both parties made detailed and extensive objections to the various deposition testimonies, but as this case was tried to the Court and not to a jury, the Court disallowed the objections.

3. There was also testimony the river was 3000 feet wide at this juncture. The Court chose the lower figure as the navigable channel of the river, particularly in light of the numerous barge fleeting facilities in the area which extended out into the river.

Nony Nacio, first mate Kendall Frickey, and Patrick Paul Marie operating as deckhand.

The SAM LEBLANC was being piloted by Captain Joseph Frye with Robert Jordan as engineer and Huey Wattigney as deckhand.

### D. Conditions at the Time of the Collisions

The Mississippi River current in the area of the collision was running approximately 4 to 5 M.P.H. in the middle of the river. There was restricted visibility in the Baton Rouge Harbor area, particularly in the area where the collisions occurred.

There was a dense fog bank or shut out fog extending across approximately two-thirds of the river from the east bank towards the west bank of the river, that is, to approximately 600 feet from the west bank. There was relatively clear water containing patchy ground fog extending approximately 600 feet from the west bank toward the dense fog.

Even though there were conditions of restricted visibility in the area of the collisions, vessels were still navigating both northbound and southbound in the harbor. However, due to the heavy fog the SAM LEBLANC was released from its intended hire to turn a ship at the Exxon dock.

### E. Progress of the ERGONOT and POINTE COUPEE prior to the accident

At approximately 10:00 A.M. on the morning of February 3, 1988, the POINTE COUPEE left the east bank of the Mississippi River below the I–10 Bridge heading northbound. The POINTE COUPEE's captain, Richard Deshotel, radioed to determine any traffic in the area prior to departing, and only received a response from the ERGONOT, advancing northbound approximately a mile and half down river from Deshotel. Deshotel had been employed as a captain for Eckstein for three years, and held operator's licenses for all waters of the United States, a radio operator's license, and an operator's license for uninspected tow boats for 15 years.

After departing the east bank, the POINTE COUPEE crossed the river to the west bank, and after reaching the west bank proceeded upriver 200 to 300 feet off the west bank. Although travelling in relatively clear water with patchy fog and visibility of a mile to a mile and a half *forward* of its position, the POINTE COUPEE was advancing 300 feet along side dense fog which blanketed at least two thirds of the river, requiring mechanical assistance, particularly in light of the strong current and winding path of the river. When the POINTE COUPEE was approximately 1000 feet below the I–10 Bridge, Deshotel made a radio check for southbound traffic, and received no response.

During this same time frame the ERGONOT was advancing upon the POINTE COUPEE. Captain Brones of the ERGONOT and Deshotel agreed to a one whistle passing whereby the ERGONOT would pass to the starboard side of the POINTE COUPEE, passing between the POINTE COUPEE and the east bank of the Mississippi River.

Pilot Charles Dedmon of the ERGONOT relieved Captain Kenny Brones at Mile 228 just downriver of the I–10 Bridge. Captain Brones informed Pilot Dedmon that he had agreed upon a one whistle overtaking with the POINTE COUPEE which was northbound about a quarter mile above the ERGONOT. Dedmon was an experienced pilot employed by Magnolia for over ten years as a captain and having worked over twenty-two years total in the pilothouse.

The ERGONOT checked for southbound traffic around the I–10 Bridge and received no response. The POINTE COUPEE was then 300 to 400 feet above the bridge, and advised the ERGONOT that the POINTE COUPEE had not picked up any targets on radar, and that it was clear of traffic to proceed upriver.

Just above the I–10 Bridge at the Capital Marine Fleet, the ERGONOT was overtaking the POINTE COUPEE such that the head of the ERGONOT tow was slightly the stern of the POINTE COUPEE travelling in the clear water and favoring the eastbank of the river. The ERGONOT was travelling approximately 800 feet to the starboard of the POINTE COUPEE though generally favoring the middle of the river. The ERGO-

NOT was proceeding in the fog bank as it passed the POINTE COUPEE without incident, despite being out of visual sight of each other. Both vessels had their radar set on at least a mile and a half range as customary for that area of the river.

Pilot Dedmon put ERGONOT's position on the air just above Red's Boat Store situated on the eastbank above the I–10 Bridge at approximately Mile 230, and received a response from the M/V BAYOU STATE who was assisting the SAM LEBLANC at the Exxon dock located on the eastbank at Mile 232.

The M/V BAYOU STATE topped around near the dock, executed a two-whistle agreement, or starboard-to-starboard, and moved into a nearby mooring facility, which was agreed to and viewed by Dedmon only on his radar due to the dense fog.

### F. *The SAM LEBLANC*

At the request of the crew of the ship the SAM LEBLANC was slated to move from the Exxon dock, the radar of the SAM LEBLANC had earlier been placed on stand-by, such that the radar had no picture and its scanner did not turn. Because of the heavy fog, the order to move the ship was cancelled, and the SAM LEBLANC prepared to depart the dock, although it is not known whether her radar was reactivated.[4]

Immediately after the M/V BAYOU STATE's maneuver, Captain Frye of the SAM LEBLANC called the ERGONOT from the Exxon dock and requested a one whistle or port-to-port passing.

Dedmon testified at trial that because a one whistle pass would have meant the SAM LEBLANC had to go across the ERGONOT's bow, he replied to the effect that no, he was out too wide. Dedmon testified that

he couldn't see the SAM LEBLANC with his eyes, but could see it on radar, and he thought they had a two-whistle agreement (or starboard-to-starboard as with the BAYOU STATE).

The Court concludes that Captain Frye and Pilot Dedmon had radio conversations regarding the manner in which the SAM LEBLANC would pass the ERGONOT. Although a one whistle passing agreement was discussed, whereby the SAM LEBLANC would cross in front of the bow of the ERGONOT tow and then proceed down river with the SAM LEBLANC and the ERGONOT passing port to port, the testimony is unclear whether such a passing agreement was in fact reached. However, as confirmed by Deshotel's sworn statement and Dedmon's testimony at trial and his deposition, Pilot Dedmon did express concern to Captain Frye regarding a one whistle passing maneuver.

### G. *Deshotel's Perception*

From his sworn statement taken the day after the accident, it is clear to the Court that Captain Deshotel understood the passing agreement to be as follows:[5] The SAM LEBLANC wanted a one whistle passing which was questioned by Dedmon. Dedmon asked Frye where he was going and Frye replied, "I am going to tie up at the boat store.[6]" Dedmon came back and stated, "why don't you see me on the two and follow the east shore down." Frye replied that "he would rather get out into the clear water and pass on the one if possible." Dedmon responded, "if you can do it quickly, do it." Frye then stated, "I am lightboat, and I can do it quickly." According to Deshotel, at that time, a one whistle agreement was agreed upon.

---

4. It is more likely than not the SAM LEBLANC's radar was not reactivated, because both Captain Deshotel and Pilot Dedmon observed by binocular that the SAM LEBLANC's radar scanner was not turning after the accident, as it should have been had it been reactivated and functioning properly. On the afternoon of the accident Coast Guard Lieutenant Hartley found the radar unit receiving power, but the scanner was not turning and the radar screen had no picture. Although bearing on the SAM LEBLANC's contribution to the accident, this is not material to the issue of

exoneration of Pointe Coupee and Eckstein presently before the Court.

5. For the purposes of determining whether Pointe Coupee and Eckstein should be exonerated from liability the Court should primarily concern itself with Deshotel's perceptions, actions, and inaction.

6. This was presumably Red's Boat Store in the vicinity on the eastbank, although no specific boat store was mentioned.

Captain Deshotel was concerned about the passing agreement between the ERGONOT and the SAM LEBLANC because in his mind it was an unsafe and dangerous passing. The Court further finds that if Deshotel was not concerned, he should have been and considerably so, particularly in light of the POINTE COUPEE's proximity to the ERGONOT, which had not completed its overtaking, and Deshotel's knowledge that all three vessels were in or near shut out fog.

The POINTE COUPEE was doublewide due to the configuration of its tow and its lead barge was carrying volatile red flag tow cargo, which Deshotel also knew was unknown to the SAM LEBLANC. In addition, given the passing agreement SAM LEBLANC proposed, Deshotel should have questioned whether SAM LEBLANC was aware of POINTE COUPEE's presence at all, as once the SAM LEBLANC executed its proposed one whistle passing, she would be confronted by the POINTE COUPEE and its wide and volatile tow proceeding northbound.

Once communications commenced with the SAM LEBLANC, which Deshotel heard on his radio on one of the two channels he was monitoring, neither Deshotel nor Dedmon made known to the SAM LEBLANC the POINTE COUPEE's position to the port side of the ERGONOT. Nor did any vessel blow a fog horn.

The Court finds that, *based upon Captain Deshotel's perceptions,* the passing agreement between the ERGONOT and the SAM LEBLANC would require the SAM LEBLANC to cut in front of the ERGONOT in shut-out fog and proceed into the area of clearer visibility on the west side of the river, downbound for the boat store. As such, the intended navigation of the SAM LEBLANC required it to cross in close proximity to the POINTE COUPEE in or near restricted visibility. A passing agreement was never initiated by Deshotel who was aware of SAM LEBLANC's intended path, as contrasted with SAM LEBLANC who more likely than

not was unaware of POINTE COUPEE's existence or location.

### H. *The First Collision*

The Court finds that the SAM LEBLANC left the Exxon dock and proceeded downriver in heavy fog conditions near the east bank and that Dedmon observed the SAM LEBLANC's direction by radar. However, when Captain Frye navigated the SAM LEBLANC near the head of the tow of the ERGONOT, he cut across the bow of the ERGONOT, colliding with the lead barge of the ERGONOT.[7] The first collision occurred in shut out fog as Dedmon did not visually see the SAM LEBLANC until it was crossing the head of the tow of the ERGONOT.

The impact caused the SAM LEBLANC to lean to starboard and, after coming out around the head of the tow, the SAM LEBLANC proceeded down the port side of the tow of the ERGONOT for a short distance and then continued in forward gear across river towards the clearer water and the POINTE COUPEE.

Immediately after impact, Dedmon radioed Frye if he was okay, to which Frye, alarmed, responded he thought he was sinking. This conversation, overheard by Deshotel according to his statement to the Coast Guard, occurred approximately five minutes after the passing agreement conversation between Frye and Dedmon.

During the five minute period between the two conversations, Deshotel made no attempt to object to a one whistle passing of the ERGONOT by the SAM LEBLANC or to at least insure by radio contact that his presence was known to the SAM LEBLANC. Deshotel did not blow his fog horn or alter his course in any manner.

### I. *The Second Collision and the Location of Captain Frye*

According to his statement to the Coast Guard the afternoon of the accident, approximately two minutes after the first collision [8],

---

7. Dedmon testified Frye radioed that he had a change of orders and had to turn around and go back to the dock, followed shortly by "oh, Lord, now I see you" and the collision.

8. This is in contrast with Deshotel's sworn statement taken the day after the accident in which he said the time span between Dedmon's radioing whether the SAM LEBLANC was alright and

Deshotel visually saw the SAM LEBLANC emerging from the fog bank approximately 300 feet to his starboard side. The Court finds that the POINTE COUPEE was operating in or near an area of restricted visibility immediately prior to and at the time of both collisions.

Upon visually sighting the SAM LEBLANC coming out of the fog headed across the bow of his tow, Deshotel chose this point to radio the SAM LEBLANC and inquire of its intentions. He received no response from Captain Frye. Seconds later, Dedmon radioed Deshotel that the SAM LEBLANC had collided with the ERGONOT and was headed Deshotel's way. Deshotel responded he could see that, and that the SAM LEBLANC was about to ram him. The SAM LEBLANC was proceeding in forward gear when it collided broadside with the head of the POINTE COUPEE's tow. After striking the bow of the POINTE COUPEE's lead barge, the SAM LEBLANC looped around *in reverse* to strike the DM946 again, this time on her port side, and from there proceeded in reverse across the remainder of the river. Ultimately the SAM LEBLANC struck barges moored in the Capitol Marine Fleet on the westbank, where she grounded.

Deshotel was bringing his throttle to neutral from the ahead position at the moment of impact of the SAM LEBLANC with the head of his tow. The Court finds that at least 20 seconds elapsed from the time that Deshotel first sighted the SAM LEBLANC and its collision with the POINTE COUPEE.[9] The Court further finds that, from the time that Deshotel questioned or should have questioned the dangerous passing agreement between the SAM LEBLANC and the ERGONOT, until the moment of impact of the SAM LEBLANC with the head of Deshotel's tow, Deshotel's only *evasive* action was to bring his throttles from ahead to neutral at the moment of impact. After impact Deshotel reversed his engines, setting off the engine alarms.

The Court further finds that between the time of the collision with the ERGONOT and the time of the impact with the POINTE COUPEE, the SAM LEBLANC was being piloted by Captain Frye. The Court is of the opinion that Frye had to be in the wheelhouse to respond as he did to Pilot Dedmon after colliding with the ERGONOT, and Frye had to be in the wheelhouse to put his engines in full reverse either at the moment of impact with the head of the POINTE COUPEE tow, seconds before or seconds after. Impact of any kind was not sufficient to reverse the engines; the gears had to be engaged to do so.

Robert Jordan, the engineer of the SAM LEBLANC was in the galley on impact with the ERGONOT, and deckhand Huey Wattigney was asleep in his room. After the first collision, Jordan went to his room to get a life jacket and seeing Wattigney in the hall, told him they had been hit. Jordan proceeded out the door of the galley and walked to the stern of the boat. On initial impact with the POINTE COUPEE Jordan was washed overboard. When he surfaced, he saw someone in the water who called his name twice. Jordan never saw the person again, and at the time, thought the individual was Wattigney.

The Court finds that the person in the water was Captain Frye, as Wattigney never fell into the river, but instead jumped safely from the SAM LEBLANC onto the lead barge of the POINTE COUPEE. No other individual involved in this incident fell or jumped into the Mississippi River, and a swimmer fortuitously passing by would not have known Jordan's name. Jordan was picked up by the M/V WOODY DUMAS.

The Court finds Jordan's deposition testimony as to the individual in the water more credible than the testimony of POINTE COUPEE first mate Kendall Frickey and Deshotel's sworn statement concerning an

---

Deshotel's sighting the SAM LEBLANC was from 20 to 30 seconds.

**9.** This assumes the SAM LEBLANC was going no more than 10 MPH at this juncture and thus would cover the 300 feet distance over which she was in sight of the POINTE COUPEE in 20.45 seconds. However, it would not be unreasonable to think the SAM LEBLANC was moving slower as Captain Frye would likely have attempted to slow his throttle upon collision with the ERGONOT.

individual being on the stern of the SAM LEBLANC prior to hitting the Capital Marine Fleet.

The Court finds it more likely than not that Frye was not an individual with the physical strength and intestinal fortitude to remain in the wheelhouse for at least two of actually three collisions, who would place the engines of the SAM LEBLANC in reverse and then retire to the stern of the boat to view it career backwards into the Capital Marine Fleet.

The Court further finds it more likely than not that after placing his engines in reverse, Frye fell into the river when the SAM LE-BLANC listed severely to starboard upon its initial impact with the POINTE COUPEE. Captain Frye was never found subsequent to this accident.

### J. The Experts

Magnolia presented two experts in support of its position that Captain Deshòtel's actions or inactions violated several navigational rules and that these violations caused and contributed to the casualty. Magnolia maintained that two experts were needed to cover areas testified to by Magnolia's original and eminently qualified expert, who died immediately prior to the trial's previous setting. The Court denied Pointe Coupee and Eckstein's motion to strike the testimony of either one of Magnolia's two experts, and assigned the objection to the weight and credibility of the witnesses.

Herb Wilson testified by deposition as a navigation expert on behalf of Magnolia. Tendered as an expert in towboat navigation in from fifteen to twenty courts of law, including this District, Wilson has approximately thirty years experience navigating towboats in the Baton Rouge Harbor. His license qualifies him as a Master, all gross tons, any vessels; and First Class Pilot, same tonnage, the Lower Mississippi River to New Orleans, *inter alia.* In addition, he has received a radar endorsement at least four times from either the U.S. Navy or Delgado College.

Magnolia's other expert Douglas Halsey was tendered and accepted as an expert in vessel safety and operations, United States Coast Guard investigations, and navigational rules.[10] Halsey served 3½ years in the U.S. Navy and 17 years in the Coast Guard.[11] He began his casualty investigation experience in 1974 and participated mainly in casualty investigations up until 1984 when he left the Coast Guard and opened a business as a safety consultant. During the last ten years Halsey has investigated several hundred marine accidents. He was selected to conduct major casualty investigations and direct joint Coast Guard and National Transportation Safety Board investigations of major casualties.

Frank Buck was tendered by Pointe Coupee and Eckstein and accepted without objection as an expert in the field of vessel operation and vessel navigation. Buck's experience on towboats and pushboats similar to the POINTE COUPEE and ERGONOT was in 1960–62, when he worked for Twenty Grand Towing, and in 1979–85 when he assisted in operating two small pushboats he had purchased for himself. Buck's navigating experience dealt more with blue water crew boats and passenger boats.

All three experts, Wilson, Halsey and Buck, agreed that Pilot Dedmon of the ERGONOT and Captain Frye of the SAM LE-BLANC violated numerous navigational rules and these violations caused or contributed to the casualty.

10. The Court denied Pointe Coupee's motion in limine to preclude testimony of Douglas Halsey for lack of qualifications due to his never holding a license to operate a vessel on the Mississippi River and his never previously testifying in a matter involving a collision on the Mississippi River.

11. In both his Navy and Coast Guard service, Halsey was stationed aboard vessels. He had the opportunity while in the Coast Guard to actually participate in the navigation of vessels and stand watches. Halsey attended marine safety programs in New Orleans and went to marine safety school in Yorktown, Virginia, where he studied safety, Rules of the Road and casualty investigations. He also attended a two-week investigation school in Oklahoma related to casualty investigations and federal regulations related thereto. He is qualified as an expert in marine safety and vessel operations and has never been tendered an expert in a field that he was not accepted.

Magnolia experts Wilson and Halsey testified, and the Court finds, that Captain Deshotel of the POINTE COUPEE violated several navigational rules which caused or contributed to the casualty, including Inland Rules 2, 5, 7, 8 and 19 discussed in more detail below.

The Court viewed the testimony of Pointe Coupee and Eckstein's expert Buck with considerable skepticism given his responses on cross examination and his apparent misunderstanding of the applicable Inland Navigational Rules.

Two egregious examples were first, Buck's position that "the purpose of navigational rules are the vessels are supposed to use it [sic] *at their discretion* [emphasis added]," and second, his steadfast contention, despite admitting that Deshotel had neither the SAM LEBLANC or the ERGONOT in visual sight, that Part B of the Rules, Subpart 2 concerning "Conduct of vessels in sight of one another" would apply as between the SAM LEBLANC and the POINTE COUPEE.[12]

### K. *The Coast Guard Report*

Over objection by Magnolia, Pointe Coupee was allowed to introduce the Coast Guard report of this accident, which found that the POINTE COUPEE did not contribute to the accident. Investigation of the collisions commenced the afternoon of their occurrence by Coast Guard Lieutenant Scott Hartley, who interviewed a number of witnesses and inspected the vessels involved.

Hartley concluded that "the predominant or principal negligent navigator" with respect to the collisions was the captain of the SAM LEBLANC, with which the Court tends to concur although this is not the issue before the Court.

However, Hartley determined that the collisions were the fault of the operators of the SAM LEBLANC and the ERGONOT and

that the POINTE COUPEE was "an innocent bystander" and did not contribute to the collisions, with which the Court specifically does not agree.

Hartley's sole practical experience concerning navigational rules occurred when he took a couple of courses at the Coast Guard Academy around 1977. He did not know there were a different set of navigational rules in force in 1988 than those he studied at the Academy. He admitted he did "not keep up with the changes that come out in the navigational rules", that he did not know the rules "without looking", and he could not be held to the definition of a one whistle passing. Harley's first experience in actually applying navigational rules came in April of 1987 when he arrived at the Coast Guard's Marine Safety Office in New Orleans, nine months prior to the SAM LEBLANC's collisions.

Hartley's deposition testimony was introduced at trial. After a review of Hartley's deposition, it is apparent he was not familiar with the navigational rules that he was applying to the facts of the instant case or that he misapplied the rules to the facts of this case.

Hartley noted several important facts in his deposition testimony which should have been highlighted in his report and which lead to the inescapable conclusion that navigational rules broken by the POINTE COUPEE contributed to the collisions.

For instance, according to his deposition testimony, after interviewing Deshotel on the date of the casualty, Hartley understood: (1) that Deshotel was concerned about the passing agreement between the SAM LEBLANC and the ERGONOT; (2) that Deshotel was aware of the collision between the SAM LEBLANC and the ERGONOT because of the radio transmission between Dedmon and Frye shortly after the collision; (3) that approximately two minutes elapsed between

12. The Court was additionally concerned with Buck's erroneous application of Rules 2 and 14(d); his position that the POINTE COUPEE was not operating in or near areas of restricted visibility despite Deshotel's statement there was shut out fog 200–300 feet to his starboard where the SAM LEBLANC and ERGONOT were travelling out of his sight; his contentions (1) that

POINTE COUPEE's navigation could not have been affected by the passing agreement between the SAM LEBLANC and the ERGONOT and (2) that Deshotel should not have transmitted on the radio because he might have created more confusion despite having five minutes in which to do so.

hearing that transmission until Deshotel first visually saw the SAM LEBLANC and realized it was on a collision course with the POINTE COUPEE; (4) that, if Deshotel had stopped or slackened his speed when he learned the ERGONOT was hit, the second collision could have and might have been prevented; (5) that but for the second collision, the drowning death of Captain Frye might have been prevented; (6) that the collision between the SAM LEBLANC and ERGONOT created a close quarters situation for all of the vessels navigating on that area of the river including the POINTE COUPEE; (7) that the POINTE COUPEE was operating in or near an area of restricted visibility; and (8) that the navigational rules provide that if Deshotel was concerned about a collision in the river between the SAM LEBLANC and the *ERGONOT,* he was required to take action necessary to avoid a collision.

Given the discrepancies between Hartley's deposition testimony and his Coast Guard report, the Court concludes it necessary to considerably discount the conclusions of Hartley's report.

### III. *Conclusions of Law*

This is an admiralty and maritime claim over which the Court has jurisdiction pursuant to 28 U.S.C. § 1333.

As Laplace Towing Corporation did not own or operate the POINTE COUPEE, Magnolia Marine has no cause of action against Laplace Towing Corporation.

■ Magnolia, as claimant in limitation, bears the burden of proving that Captain Frye's death was caused by the negligence of the POINTE COUPEE. *Farrell Lines, Inc. v. Jones,* 530 F.2d 7, 10 (5th Cir.1976).

■ The POINTE COUPEE was navigated in violation of the Inland Navigational Rules, 33 U.S.C. § 2001, *et seq.* such that these violations were casually related to the death of Captain Frye. Magnolia has sustained its burden of showing negligence of the POINTE COUPEE which was causally related to Captain Frye's death.

In *Beldon v. Chase,* 150 U.S. 674, 14 S.Ct. 264, 37 L.Ed. 1218 (1893), the seminal case concerning the application of Navigational Rules, the Supreme Court stated:

> The Rules ... have the force of statutory enactment; and their construction, when put in evidence, ... is for the Court, whose duty is to apply them, as a matter of law, upon the facts of a given case. They are not mere prudential regulations, but binding enactments, obligatory from the time that the necessity for precaution begins, and continuing so long as the means and opportunity to avoid the danger remain. Obviously, they must be rigorously enforced, in order to attain the object for which they were framed, which could not be secured if the Masters of vessels were permitted to indulge their discretion in respect of obeying or departing from them. (Citations omitted)

Having thus refuted Mr. Buck's theory on the discretionary use of the rules, the Court reaffirmed the rule of *The Pennsylvania,* 19 Wall 125, 126, 22 L.Ed. 148 (1873) which is:

> When a vessel has committed a positive breach of a statute, she must show, not only that probably her fault did not contribute to the disaster, but that it could not have done so."

As discussed below, Pointe Coupee and Eckstein have not met this burden.

Specifically, the Court finds that Pointe Coupee and Eckstein breached Rules 2, 5, 7, 8, and 19, and in doing so, contributed to the death of Captain Frye.

### A. *Rule 7*

■ Rule 7(a), dealing with "Risk of Collision", provides that

> every vessel shall use all available means appropriate in the prevailing circumstances and conditions to determine if the risk of collision exists.

If there is any question such risk may exist, Rule 7(b) provides:

> Proper use shall be made of the radar equipment if fitted and operational, including long-range scanning to obtain every warning of risk of collision and radar plotting or equivalent systematic observation of detected objects.

By failing to announce the presence of the POINTE COUPEE to the SAM LEBLANC, which had never responded to the POINTE COUPEE radio requests for southbound traffic and which was clearly heading into the POINTE COUPEE on a one whistle pass of the ERGONOT, Deshotel breached Rules 7(a) and navigational axioms articulated by Judge Learned Hand in *Ocean Steamship Co. of Savannah v. United States of America*, 38 F.2d 782 (2nd Cir.1930):

> Ambiguities must be resolved in favor of safety ... [and], it must always be remembered that it is the risk of collision not the collision itself that master must avoid.

Although the Court is unwilling to make a finding with respect to the seaworthiness of the POINTE COUPEE [13], the SAM LEBLANC's emergence out of a fog bank three hundred feet away should have come as no surprise to Deshotel.[14] The Court can find no satisfactory explanation why the navigation of the SAM LEBLANC could not have been tracked by Deshotel on his radar other than that Deshotel was not properly monitoring his radar or that it was not functioning properly. Thus, the POINTE COUPEE violated Rule 7(b) and Rule 5, The Lookout Rule.[15] The Court finds it inconceivable that a pilot aware that a boat travelling within a fog bank and bearing down on his vessel would neglect to speak up and object to the one whistle pass and/or make his presence and location known.[16]

### B. *Rule 8*

■ Deshotel violated rule 7 in not appreciating the risk of collision, but also Rule 8 in failing to take action after the risk of collision became apparent, i.e., when Deshotel first heard the one whistle passing request by the SAM LEBLANC and no later than the second Deshotel knew the ERGONOT was hit.

Rule 8 provides:

> If necessary to avoid collision or allow more time to assess the situation, a vessel shall slacken her speed or take all the way off by stopping or reversing her means of propulsion.

At that time, Deshotel had the duty to do what was necessary to avoid a collision: apprise the SAM LEBLANC of his presence; slow down; stop and hold his position; throw one engine into reverse, keeping the other forward to maintain steerage [17]. Instead, Deshotel elected to do nothing until the SAM LEBLANC was in sight, out of control, and 300 feet away.

By remaining silent, not trying to establish a passing agreement, and not taking any action to avoid the risk of collision, Captain

---

**13.** Due to Captain Deshotel's death, counsel for Magnolia never had the opportunity to cross examine him. Although Deshotel's sworn statement tends to indicate his radar was functioning properly, given the facts of this case, the Court is unwilling to so find. The Court having determined that POINTE COUPEE violations of navigational rules contributed to the death of Captain Frye, a finding of unseaworthiness of the POINTE COUPEE is unnecessary to the Court's decision.

**14.** Although the presence of the POINTE COUPEE may have come as a surprise to the SAM LEBLANC, whose radar was apparently not functioning, expert testimony established the POINTE COUPEE's radar had the capability, if properly functioning, of tracking the path of the SAM LEBLANC from the Exxon dock, excepting the point in time when the SAM LEBLANC collided with the ERGONOT and the two boats would have merged into one form on the radar screen.

**15.** Rule 5 provides that:
every vessel shall at all times maintain a proper lookout by sight and hearing as well as by all available means appropriate in the prevailing circumstances and conditions so as to make a full appraisal of the situation and of the risk of collision.

**16.** Deshotel's inaction was also a violation of Rule 2, the General Responsibility Rule, which provides that "nothing in these Rules shall exonerate any vessel, or the owner, master, or crew thereof, from the consequences of any neglect to comply with these rules or of the neglect of any precaution which may be required by the ordinary practice of seaman, or by the special circumstances of the case."

**17.** The Court is aware of Buck's testimony that POINTE COUPEE might not have maintained control of its tow had it slowed or reversed. The Court finds this improbable given the ease with which the POINTE COUPEE recovered its lead barge, which broke off from the tow when hit the second time by the SAM LEBLANC. In any event, the possible risk of loosing steerage momentarily was worth taking in order to avoid the risk of collision or collision itself.

Deshotel was a major contributor in the SAM LEBLANC's collision with the ERGO-NOT and particularly, with the POINTE COUPEE.

### C. *Rule 19*

 Rule 19, The Conduct of Vessels in Restricted Visibility, applies to the facts of this case. The Court finds that the POINTE COUPEE was navigating in or near restricted visibility.

See *The Edward E. Loomis,* 86 F.2d 705, 708 (2nd Cir.1936) ("A vessel which may herself be in the clear is not excused from observance of the rules when skirting or approaching a patch of haze from which an obscured vessel may suddenly emerge.); *Valley Towing Service, Inc. v. S/S AMERICAN WHEAT,* 618 F.2d 341 (5th Cir.1980) (holding that a vessel navigating the periphery of a fog bank was governed by the restricted visibility rule); *The PAPOOSE,* 85 F.2d 54 (2nd Cir.), *cert. denied,* 299 U.S. 603, 57 S.Ct. 230, 81 L.Ed. 445 (1936).

In addition, when asked what were the fog conditions on the river, in his sworn statement, Deshotel responded "Visibility was poor, current was swift, traffic was very, very light." Two out of three vessels were operating in dense fog and in a close-quarters situation, positively so once the ERGONOT was hit.

Rule 19(a) provides:

This rule applies to vessels not in sight of one another when navigating in or near an area of restricted visibility.

Rule (b) provides:

A vessel which detects by radar alone the presence of another vessel shall determine if a close-quarters situation is developing or a risk of collision exists. If so, she shall take avoiding action in ample time ...

Rule 19(e) provides:

Except where it has been determined that a risk of collision does not exist, every vessel which hears apparently forward of her beam the fog signal of another vessel, or which cannot avoid a close-quarters situation with another vessel forward of her beam, shall reduce her speed to the minimum at which she can be kept on course.

She shall, if necessary, take all her way off and, in any event, navigate with extreme caution until danger of collision is over.

By waiting until he could *see* the SAM LEBLANC emerge from the fog bank three hundred (300) feet away to ask the SAM LEBLANC's intentions and to put his engines into neutral, Deshotel violated all three of these sections of Rule 19.

Magnolia's expert Captain Wilson testified that Deshotel would have had no problem controlling his tow had he slowed, reversed, or backed down the river under the conditions existing at the time, and that a matter of seconds would have prevented the SAM LEBLANC's collision with the POINTE COUPEE. Those seconds could have been accomplished by putting the POINTE COUPEE's engines into neutral or reverse upon hearing of the SAM LEBLANC's one whistle passing intentions with the ERGONOT, and may have been unnecessary had the POINTE COUPEE announced its presence to the SAM LEBLANC and requested the SAM LEBLANC wait until the two north-bound vessels had passed. After all, what was the hurry?

Pointe Coupee raised the issue that all the actions of Captain Deshotel were taken after he was put *in extremis.* In this regard the court in *Afran Transport Co. v. S.S. TRANSCOLORADO,* 458 F.2d 164 (5th Cir. 1972) noted:

[I]n collision situations—unlike common law incidents where two strangers are involved—in which each vessel has duties toward the other that are formally well defined and known, the one who is put to a sudden choice of action to avoid hazard created by the patent fault of the other has considerable latitude. The choices of stopping engines or going ahead, going to port rather that starboard, are to be judged not by an armchaired admiral ..., who has hours, days, weeks, months, or years to reflect, but in the light of choices suddenly forced on by the neglect of the one now seeking total absolution. For, "errors in judgment committed by a vessel put in sudden peril through no fault of her own are to be leniently judged."

458 F.2d at 166–167, quoting *Union Oil Co. of Cal. v. Tug MARY MALOY*, 414 F.2d 669, 674 (1969) (citations omitted).

The Court might be won over by this persuasive point but for the language "in sudden peril through no fault of her own." Aided by two radios, radar, and the full knowledge of the presence, location and direction of all three vessels, two of which were in dense fog, the POINTE COUPEE had more than five minutes in which to do **SOMETHING** to avoid these collisions, and instead chose to do nothing at all until seeing the SAM LEBLANC three hundred (300) feet away. At that point Deshotel's peril upon sighting the SAM LEBLANC emerging from the fog bank was hardly sudden nor without fault of the POINTE COUPEE.

The Court finds (1) that the SAM LEBLANC'S collision with the ERGONOT may not have occurred had the POINTE COUPEE made its presence and location known to the SAM LEBLANC once radio communications were commenced between the SAM LEBLANC and the ERGONOT or otherwise taken action to avert a collision, (2) that inaction on the part of the POINTE COUPEE contributed to the SAM LEBLANC's collision with the ERGONOT, and (3) that negligence on the part of the POINTE COUPEE contributed to the SAM LEBLANC'S collision with the POINTE COUPEE.

The Court further finds that Captain Joseph Frye drowned on the 3rd of January, 1988, and that a contributing cause of his drowning was the SAM LEBLANC's collision with the ERGONOT and especially, the SAM LEBLANC's collision with the POINTE COUPEE.

The Court does not imply by its ruling that the SAM LEBLANC and the ERGONOT did not contribute to the death of JOSEPH FRYE.

The Court concludes that the POINTE COUPEE contributed to the death of Captain Frye and therefore may not be exonerated from liability for its part in the death of Joseph Frye. Accordingly,

**IT IS ORDERED THAT**

1. Pointe Coupee, Inc. and Eckstein Marine Company are not entitled to exoneration of all liability for the death of Joseph Frye, but are entitled to limitation of liability to the stipulated post-accident value of the POINTE COUPEE, which was two hundred twenty-five thousand dollars ($225,000) plus her pending freight, which was eleven thousand three hundred sixty-one dollars and thirty cents ($11,361.30), plus interest at the Louisiana legal rate of interest.

2. Laplace Towing Corporation is DISMISSED, and

3. Costs to be divided evenly between Pointe Coupee and Eckstein Marine.